2008 WY 67

**Rita Ann HUMPHREY, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 06–249.

Supreme Court of Wyoming.

June 16, 2008.

Representing Appellant: Tina N. Kerin, Appellate Counsel; Donna D. Domonkos, Senior Assistant Appellate Counsel; David Westling, Senior Assistant Appellate Counsel. Argument by Ms. Domonkos and Mr. Westling.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Leda M. Pojman, Assistant Attorney General. Argument by Ms. Pojman.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, BURKE, JJ.

GOLDEN, Justice.

[¶ 1] In March 2006, a jury convicted Appellant Rita Ann Humphrey of second degree murder in the 1977 death of her husband, Jack Humphrey. On appeal, Appellant challenges her conviction on grounds of speedy trial and due process violations and evidentiary errors. We find no reversible error in the issues presented and affirm.

## ISSUES

[¶ 2] Appellant presents the following issues for our consideration:

I. Whether Appellant was denied her right to a speedy trial under W.R.Cr.P. 48, with a delay of 270 days, and under the United States Constitution, with a delay of 561 days.

II. Whether Appellant was denied her Fourteenth Amendment right to due process when the State delayed charging her for over 26 years. Appellant was substantially prejudiced by the delay.

III. Whether the district court committed reversible error when it admitted Jack Humphrey's hearsay statements under the state of mind exception to the hearsay rule. Jack Humphrey's state of mind was not an issue at trial and the statements did not help the trier of fact determine Appellant's state of mind.

IV. Whether the district court committed an abuse of discretion by improperly admitting hearsay evidence contrary to W.R.E. 803(6) and contrary to the completeness requirements of W.R.E. 106.

## FACTS

*Trial Evidence*

[¶ 3] Appellant and Jack were married in 1967. For many years, it was a happy marriage. However, in 1977, the marital relationship deteriorated. Appellant became increasingly and openly hostile toward Jack. They were no longer intimate, and Appellant developed a relationship with another man, Ron Akers. Financial problems also arose in the relationship. Household bills were not being paid, including the mortgage on the family home, checks were bouncing, and a large sum of money, approximately $3,700.00, was missing out of their joint bank account at Hilltop National Bank (Hilltop Bank). Jack eventually spoke with personnel at Hilltop Bank on November 22, 1977, about the missing money and discovered Appellant had not deposited several of his paychecks, which explained the account shortage and the resulting bounced checks. That discovery caused further tension between Jack and Appellant. That night, Jack was noticeably upset and angry at Appellant as he discussed the financial mess with his sister, Bonnie Humphrey.

[¶ 4] Around 4:30 a.m. the next morning, November 23, Appellant telephoned her sister, Donna Baldwin. Appellant informed Baldwin something was wrong with Jack, and she needed Baldwin's assistance immediately. Baldwin and her boyfriend at the time, Frank Finch, arrived at Appellant's home within minutes, entering through the back door into the kitchen where Appellant was situated. After speaking with Appellant, Baldwin and Finch went to the couple's bedroom. Upon entering the room, they immediately smelled the odor of gun powder and noticed Jack had been shot.

[¶ 5] Baldwin and Finch then returned to the kitchen, and Baldwin contacted the police and Jack's brother, Larry Humphrey, who lived nearby. Finch noticed a rifle laying on the kitchen counter, wrapped in what appeared to be an infant's blanket. Finch grabbed the rifle and carried it out the back door, where he put the rifle down and pushed the barrel into the snow. Upon returning to the kitchen, Appellant handed him an empty bullet casing, which he tossed out the back door.

[¶ 6] Around 5:00 a.m., Officer Jeff Lord of the Evansville Police Department arrived at the Humphrey residence. Finch escorted Officer Lord to the master bedroom, where the officer observed Jack lying face down on a bed, covered by a blanket, with a gunshot wound to the back of his head. Forensic analysis of the crime scene indicated the blanket was placed over Jack after he was shot. Officer Lord did not find a firearm in the vicinity of the body.

[¶ 7] Officer Lord asked Appellant what she knew about her husband's death. Appellant stated she had fallen asleep in the basement while watching TV and she was awakened by a sound which she believed to be a gunshot. She then went upstairs and attempted to rouse her husband. When Jack did not respond, she telephoned her sister.

[¶ 8] After speaking with Appellant, Officer Lord conducted a protective sweep of the home. He found no evidence of forced entry or other signs of an intruder, even though the doors to the Humphrey residence were kept locked at night. Upon the arrival of other officers at the scene, Officer Lord conducted a perimeter search of the premises and found a .243 caliber Ruger M77 rifle and an empty shell casing lying in the snow by the back door of the residence. The rifle was later identified as Appellant's custom made rifle, which she proficiently used for hunting. Appellant's rifle, as well as the couple's other firearms, was always kept unloaded in the closet of the master bedroom. The ammunition for the firearms was stored separately in a cupboard by the kitchen. The rifle was subsequently identified as the murder weapon.

[¶ 9] Appellant was interviewed that morning at the Natrona County Sheriff's Office. While there, she also spoke with Bonnie Humphrey, who pressed her for information about Jack's death. During that conversation, Appellant put her hands over her face and stated: "God, what have I

done?" A gunshot residue kit was also collected from Appellant that morning. Analysis of the residue taken from the back of Appellant's left hand disclosed three fragments of partially burned gunpowder.

[¶ 10] Within a week of the murder, Appellant and Akers were seen together at the Sage Club in Casper. By January, Akers was living at Appellant's house, driving Jack's truck and wearing his clothes. Approximately one week after Jack's death, Appellant began pursuing the proceeds of his life insurance policies, which she ultimately received in the amount of $30,285.46. Seven months later, Appellant received the proceeds from the sale of the couple's home and other real property.

*Procedural Facts*

[¶ 11] Appellant's legal woes began on April 11, 1980, when a grand jury indicted her for the first degree murder of her husband. The district court later granted Appellant's April 14, 1980, request for a preliminary hearing and, on May 7, it remanded the case to county court.[1] Also on May 7, Appellant waived her right to a speedy preliminary hearing, and stipulated to a June 23, 1980, preliminary hearing date. The preliminary hearing failed to produce sufficient probable cause to support the murder charge, and the county court issued an order dismissing the case on July 2, 1980. The district court formally dismissed the indictment on August 22, 1980.

[¶ 12] In 1999, the Evansville Police Department reopened the investigation into Jack Humphrey's death. That investigation led to the refiling of the first degree murder charge against Appellant on March 5, 2004. Following a preliminary hearing on May 26, 2004, Appellant was bound over to district court. The district court initially set Appellant's trial for September 27, 2004, stacked behind a number of other trials which were also set for that day. On July 8, Appellant filed a "Motion for Date Certain for Trial" wherein she requested that her trial be continued to a later date on a more reasonable schedule. On July 19, 2004, the district court

moved the trial to the October 18 trial stack because of the court's crowded docket. At Appellant's arraignment on August 10, and in response to defense counsel's concerns about the trial setting, the district court vacated the October 18 trial date. During a scheduling conference held on August 25, the parties agreed to a January 3, 2005, trial date.

[¶ 13] Two days later, on August 27, 2004, Appellant moved to dismiss the murder charge, arguing that her constitutional right to a speedy trial under both the United States and Wyoming Constitutions had been violated by the excessive delay in bringing her to trial. Appellant based her speedy trial claim on the lapse in time between the filing of the initial indictment in 1980 and the filing of the instant information in 2004. On September 10, Appellant filed another motion to dismiss the murder charge, this time alleging that the 24–year delay in recharging her for the 1977 murder of her husband transgressed her constitutional right to due process. Appellant contended that her right to a fair trial was prejudiced by the delay due to the death of several witnesses and the loss of potential evidence. In addition to these motions, Appellant filed numerous motions pertaining to evidentiary matters, including multiple suppression motions.

[¶ 14] The district court heard testimony and argument on Appellant's motions to dismiss on October 28, 2004, and took the matters under advisement. The district court ultimately determined that Appellant's constitutional speedy trial right had been violated and, on December 20, 2004, the court entered an order dismissing the case. In finding a speedy trial violation, the district court considered the entire time period between the initial April 11, 1980, indictment and the January 3, 2005, trial setting. The district court did not rule on Appellant's due process claim.

[¶ 15] This Court subsequently granted the State's petition for review and reversed the district court's order of dismissal. *State v. Humphrey*, 2005 WY 131, 120 P.3d 1027 (Wyo.2005) (*Humphrey I*), *cert. denied,*

---

1. In 2000, legislation was enacted reforming the county court system into the present circuit court system. 2000 Wyo. Sess. Laws, ch. 24.

*Humphrey v. Wyoming,* 546 U.S. 1139, 126 S.Ct. 1152, 163 L.Ed.2d 1002 (2006). We held that the district court erred in considering the period of time during which no charges were pending against Appellant—August 22, 1980, to March 5, 2004—in holding that Appellant's constitutional right to a speedy trial had been abridged. *Id.,* ¶¶ 12, 18, 120 P.3d at 1030–31.

[¶ 16] On remand, the district court, with the parties' concurrence, set Appellant's trial for March 13, 2006. Thereafter, Appellant renewed her speedy trial and due process motions to dismiss. On January 30–31, 2006, the district court, once again, heard testimony and argument on Appellant's motions to dismiss, as well as the parties' other outstanding motions. After reexamining the length of delay in the criminal proceedings and the reasons for the delay, the district court declined to find a constitutional speedy trial violation. In addition, the district court found no evidence of improper prosecutorial motive underlying the 24–year charging, as required under *Fortner v. State,* 843 P.2d 1139, 1142 (Wyo.1992), and denied Appellant's due process claim.

[¶ 17] Appellant's trial commenced as scheduled on March 13 and concluded on March 24, 2006. The jury found Appellant guilty on the lesser offense of second degree murder. The district court sentenced Appellant on June 15, 2006, to a term of imprisonment of 25 to 40 years. This appeal followed.

## DISCUSSION

### A. Speedy Trial

*Standard of Review*

[¶ 18] We review a speedy trial claim to ensure the mandates of W.R.Cr.P. 48(b) and constitutional guarantees have been met. *Yung v. State,* 906 P.2d 1028, 1032 (Wyo.1995). We examine de novo the constitutional question of whether a defendant has been denied a speedy trial in violation of the Sixth Amendment to the United States Constitution and Art. 1, § 10 of the Wyoming Constitution. We review the district court's factual findings for clear error. *Sisneros v. State,* 2005 WY 139, ¶ 16, 121

P.3d 790, 796–97 (Wyo.2005); *Humphrey I,* ¶ 8, 120 P.3d at 1029.

*Analysis*

[¶ 19] We first consider Appellant's contention that her speedy trial right under W.R.Cr.P. 48(b)[2] was violated when she was not tried within 180 days of her arraignment. The record reveals Appellant expressly waived the time limitations of the rule when she sought, via her motion for a date certain, a continuance of the initial trial date. The record also shows that, upon remand from this Court's reversal of the district court's order of dismissal, Appellant agreed to a trial setting beyond the rule's 180–day requirement. We hold Appellant waived the speedy trial requirements of Rule 48(b), and thus this claim, by her actions in the district court.

[¶ 20] We now turn to the question of whether Appellant's constitutional right to a speedy trial was infringed. The Sixth Amendment guarantees every criminal defendant a speedy and public trial. *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), set forth the benchmark test that applies to constitutional speedy trial claims. The *Barker* test requires consideration of four factors in determining whether a speedy trial violation has occurred: the length of delay; the reason for the delay; the defendant's assertion of her right; and the prejudice to the defendant. *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192; *Strandlien v. State,* 2007 WY 66, ¶ 6, 156 P.3d 986, 990 (Wyo.2007); *Humphrey I,* ¶ 9, 120 P.3d at 1029; *Berry v. State,* 2004 WY 81, ¶ 31, 93 P.3d 222, 230–31 (Wyo.2004). None of these factors alone are dispositive. Rather, the factors must be considered together and balanced in relation to all of the relevant circumstances of the delay in bringing the defendant to trial. *Barker,* 407 U.S. at 533, 92 S.Ct. at 2193; *Strandlien,* ¶ 6, 156 P.3d at 990; *Walters v. State,* 2004 WY 37, ¶ 10, 87 P.3d 793, 795 (Wyo.2004). The ultimate question is "whether the delay in bringing the accused to trial was unreasonable, that is, whether it substantially impaired the right of

---

**2.** W.R.Cr.P. 48(b) requires that a defendant's trial be held within 180 days of arraignment unless

certain exceptions apply.

the accused to a fair trial." *Walters*, ¶ 10, 87 P.3d at 795 (quoting *Warner v. State*, 2001 WY 67, ¶ 10, 28 P.3d 21, 26 (Wyo.2001)). When a speedy trial violation is found to have occurred, the charges must be dismissed. *Walters*, ¶ 10, 87 P.3d at 795; *see also Barker*, 407 U.S. at 522, 92 S.Ct. at 2188.

[¶ 21]   We begin our analysis with the first factor of the *Barker* test—the length of delay.   The law is well-settled that the speedy trial right attaches upon the filing of a criminal complaint or the arrest of the defendant, whichever occurs first. *Strandlien*, ¶ 8, 156 P.3d at 990; *Jennings v. State*, 4 P.3d 915, 921 (Wyo.2000); *see also United States v. MacDonald*, 456 U.S. 1, 6–7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982); *United States v. Marion*, 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971). We recently reiterated that the speedy trial guarantee does not apply to the period of time between the dismissal of a charge and the subsequent refiling of the charge, provided the defendant is not held in continuous custody.   That is, "the Speedy Trial Clause has no application to the period of time in which a defendant is neither under arrest nor formally charged." *Humphrey I*, ¶¶ 11–13, 17, 120 P.3d at 1030–31; *see also United States v. Loud Hawk*, 474 U.S. 302, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986); *MacDonald*, 456 U.S. at 6–10, 102 S.Ct. at 1501–03. We have also recognized that when a dismissed charge is supplanted by another charge, "the periods of formal charge by a single sovereign for the same criminal act are tacked together even if the charges are different." *Strandlien*, ¶ 8, 156 P.3d at 990 (quoting *Caton v. State*, 709 P.2d 1260, 1264 (Wyo.1985)).

[¶ 22]   On the basis of these principles, we find that the speedy trial clock in this case initially began on April 11, 1980, when the indictment was filed and Appellant was arrested, and continued to run until the indictment was formally dismissed by the district court on August 22, 1980.   The clock resumed on March 5, 2004, when the murder charge was re-filed against Appellant.   It stopped again when the district court dismissed the case on December 20, 2004.   The speedy trial clock restarted on October 26, 2005, upon the filing in the district court of this Court's mandate reversing the December 20 order of dismissal, and continued to run until Appellant's trial began on March 13, 2006.   *See Sodergren v. State*, 715 P.2d 170, 178 (Wyo.1986); *Grable v. State*, 649 P.2d 663, 670 (Wyo.1982), *overruled on other grounds by Vlahos v. State*, 2003 WY 103, 75 P.3d 628 (Wyo.2003).   The total elapsed time to trial, excluding the time when no charge was pending against Appellant, was 561 days.[3]   Consistent with prior cases, we conclude that the length of delay in bringing Appellant to trial warrants examination of the remaining speedy trial factors.   *See Strandlien*, ¶ 9, 156 P.3d at 990 (762 days); *Sisneros*, ¶ 19, 121 P.3d at 797 (349 days); *Berry*, ¶ 34, 93 P.3d at 232 (720 days); *Warner*, ¶ 12, 28 P.3d at 26 (658 days).

[¶ 23]   We therefore turn to the reasons for the delay.   In conducting this analysis we examine which party was responsible for the delay.   On this factor, we have stated:

"A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.   A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay."

*Wehr v. State*, 841 P.2d [104,] 112–13 [ (Wyo.1992) ] (*quoting Barker v. Wingo*, 407 U.S. 514, 531, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)).   Official bad faith in causing delay is weighed heavily against the government. *Barker*, 407 U.S. at 531, 92 S.Ct. 2182.   "Delays attributable to the defendant are deducted from the equation." *Jennings v. State*, 4 P.3d 915, 921 (Wyo.2000).   "We weigh any delay properly attributable to the defendant against the

---

**3.**   The district court adopted Appellant's calculation on this factor and concluded that the total elapsed time was 557 days.   However, our re-view of the record discloses that the total delay was 561 days.

delay chargeable to the State. We have frequently acknowledged a defendant may defeat his claim to a speedy trial by his own dilatory practices." *Wehr*, 841 P.2d at 113.

*Whitney v. State*, 2004 WY 118, ¶ 42, 99 P.3d 457, 471–72 (Wyo.2004); *see also Strandlien*, ¶ 10, 156 P.3d at 991.

[¶ 24] An examination of the record in this case discloses that a total of 133 days elapsed in the 1980 criminal action. In that case, Appellant sought and obtained a preliminary hearing, resulting in a 56–day delay in the criminal proceedings.[4] After the preliminary hearing failed to produce sufficient probable cause to support the murder charge and the county court dismissed the case, an additional 51 days passed before the district court formally dismissed the indictment against Appellant.

[¶ 25] In the instant criminal action, excluding the time when no charge was pending against Appellant, a total of 428 days passed between the date Appellant was recharged with the murder of her husband, March 5, 2004, and the date of Appellant's trial, March 13, 2006. The record reflects that Appellant promptly waived her right to a speedy preliminary hearing and requested that the preliminary hearing be held in May on a date convenient to the circuit court and counsel. In accordance with Appellant's request, the preliminary hearing was continued to May 26, thereby resulting in a 56–day delay in the proceedings beyond the requisite 20–day preliminary hearing period.[5] After the case was bound over to district court, there was a 29–day delay in Appellant's arraignment caused by a scheduling misunderstanding between defense counsel and the district court. Appellant then obtained a continuance of the October 18 trial, resulting in a 63–day delay in the proceedings leading up to the district court's dismissal of the case on December 20, 2004. Thereafter, following this Court's reversal of that order of dismissal and accompanying remand of the case to

the district court for trial, the parties agreed to a trial date of March 13, 2006, amounting to an additional delay of 138 days.

[¶ 26] From our review of the record, we find that, of the 561 days at issue in this case, delays amounting to 80 days were occasioned by neutral factors not directly attributable to Appellant or the State. We also find the delays surrounding the preliminary hearings in both criminal actions and the continuance of the October 18 trial date in the present action, totaling 175 days, are directly attributable to Appellant, and that the 138–day delay following this Court's remand is attributable to both Appellant and the State. We conclude, on the whole, that the reasons for the delay in this case weigh evenly in favor of and against each party.

[¶ 27] Turning to the third factor, there is no question Appellant asserted her constitutional right to a speedy trial. During the 1980 criminal proceedings, Appellant filed a motion to dismiss for lack of a speedy trial and filed a separate demand for a speedy trial. After the refiling of the criminal charge, Appellant filed two additional motions to dismiss for failure to afford her a speedy trial, as well as other pleadings in support of her speedy trial claim. Appellant's assertions of the speedy trial right, however, were intertwined with waivers of speedy preliminary hearings in both criminal actions, a request for a continuance of the trial date in the instant criminal action, continued acquiescence to the timetables set by the district court, numerous pretrial motions that required evidentiary hearings, and a request for a five-month stay in the proceedings while Appellant pursued her speedy trial complaint in the United States Supreme Court. Accordingly, we find that this factor weighs only slightly in Appellant's favor.

[¶ 28] The final factor we consider is the degree of prejudice to Appellant caused by the delay. We assess prejudice in

---

4. Appellant was not legally entitled to a preliminary hearing following the grand jury indictment and, therefore, it was not a matter of due course in the criminal proceedings. W.R.Cr.P. 5.1(a) (formerly W.R.Cr.P. 7).

5. W.R.Cr.P. 5(c) mandates that a preliminary hearing be held within 20 days of the defendant's initial court appearance if the defendant is not in custody. Appellant was not in custody and, accordingly, the preliminary hearing was required to be held within 20 days of her March 11 initial appearance.

light of the interests the particular evils the speedy trial right is intended to prevent: (1) lengthy pretrial incarceration; (2) pretrial anxiety; and (3) impairment of the defense. *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193; *Strandlien*, ¶ 14, 156 P.3d at 991; *Whitney*, ¶ 54, 99 P.3d at 475. Impairment of the defense is the most serious element "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

[¶ 29] Appellant initially contends that the delay in her case was so lengthy as to give rise to a presumption of prejudice. We have held that "until delay exceeds a point where there is a 'probability of substantial prejudice,' the burden of proving prejudice should remain with the accused." *Strandlien*, ¶ 15, 156 P.3d at 991 (quoting *Caton*, 709 P.2d at 1266); *Whitney*, ¶ 55, 99 P.3d at 475. We disagree with Appellant's conclusion that the length of delay occasioned in this case, standing alone, raises a presumption of prejudice. Consequently, we decline to relieve Appellant of her burden of establishing actual prejudice.

[¶ 30] On the prejudice prong, Appellant only argues that the delay impaired her defense of the charge. In support of this contention, Appellant points to the unavailability of certain witnesses and evidence resulting from the passage of time between the dismissal of the 1980 criminal action and the refiling of the murder charge in 2004.[6] The obvious flaw in Appellant's argument, as noted above, is that the protection of the Speedy Trial Clause has no application to the period of time in which she was neither under arrest nor formally charged for the murder of her husband. Any prejudice flowing from the loss of witnesses and evidence during the 24-year gap between the criminal prosecutions must be scrutinized under the tenets of the Due Process Clause, not the Speedy Trial Clause. *MacDonald*, 456 U.S. at 7–9, 102 S.Ct. at 1501–02. Appellant does not offer any evidence or argument of prejudice resulting from the 561–day delay at issue here.

Consequently, this factor weighs heavily against Appellant.

[¶ 31] In balancing the four *Barker* factors, we hold that Appellant was not denied her constitutional right to a speedy trial. Although a delay occurred in bringing Appellant to trial and Appellant asserted her right to a speedy trial, the length of the delay was not unreasonable in light of the facts in this case. Furthermore, and most importantly, Appellant has not demonstrated actual prejudice arising from the delay in the criminal proceedings. Under the circumstances, dismissal of the criminal charge against Appellant is not warranted.

### B. Due Process

[¶ 32] Appellant contends her right to due process under the Fourteenth Amendment to the United States Constitution[7] was violated by the 24–year delay in re-charging her for the 1977 murder of her husband, and she faults the district court for denying her motion to dismiss the criminal charge. Appellant claims she was substantially prejudiced by the delay due to the death of several potential witnesses and the loss of certain evidence essential to her defense. Whether Appellant's constitutional right to due process was violated is a question of law that we review de novo. *Wilkie v. State*, 2002 WY 164, ¶ 4, 56 P.3d 1023, 1024 (Wyo.2002) (constitutional issues are questions of law and are reviewed de novo); *see also Pope v. State*, 2002 WY 9, ¶ 14, 38 P.3d 1069, 1072 (Wyo. 2002); *Taylor v. State*, 7 P.3d 15, 19 (Wyo. 2000).

[¶ 33] Wyoming does not have a statute of limitations for the prosecution of criminal offenses. Addressing the issue previously, this Court has said:

There is no question the legislature would have the authority to enact a statute of limitation, and the failure to adopt one does not appear to be oversight. Instead, it represents a conscious decision to refrain from extending grace through a stat-

---

6. The unavailability of the witnesses and evidence formed the basis for the district court's dismissal of the case on speedy trial grounds in December 2004.

7. The Fourteenth Amendment states in relevant part: "nor shall any State deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1.

ute of limitation in criminal cases. Consistently with our statement in *Story [v. State]*, 721 P.2d [1020,] 1026 [ (Wyo.1986) ], "whether statutes of limitations governing prosecution of criminal offenses should be adopted at all is a matter solely for the legislature."

*Vernier v. State*, 909 P.2d 1344, 1348 (Wyo. 1996) (emphasis omitted).

[¶ 34] In the absence of a statute of limitations, which is the primary guarantee against bringing overly stale criminal charges, the prosecution for a criminal offense may be commenced at any time during the life of the offender unless the delay in charging denied the accused her constitutional right to due process. *Fortner v. State*, 843 P.2d 1139, 1142 (Wyo.1992). Adopting the rule articulated in *United States v. Marion*, 404 U.S. 307, 323–26, 92 S.Ct. 455, 465–66, 30 L.Ed.2d 468 (1971), we have held that precharging delay is not a violation of due process absent a showing of both an intentional delay by the state to gain a tactical advantage over the accused and actual prejudice resulting from the delay. *Vernier*, 909 P.2d at 1348–50; *Fortner*, 843 P.2d at 1142–44; *Phillips v. State*, 835 P.2d 1062, 1069–70 (Wyo.1992); *Story v. State*, 721 P.2d 1020, 1027–29 (Wyo.1986). The burden of proving the required two-part showing lies with the appellant. *Id.*

[¶ 35] We find that Appellant has not carried her burden on either prong. First, Appellant has not demonstrated that the State purposely delayed filing the criminal charge in order to gain a tactical advantage over her or that the delay was the product of an improper prosecutorial motive. Appellant acknowledges as much, but claims the requirement of proving an improper prosecutorial motive places an unfair burden on her when the State has exclusive access to the information concerning the reasons for the delay in filing the criminal charge. She argues the State should bear the burden of justifying the charging delay, and urges this Court to absolve her of the responsibility of proving prosecutorial bad faith.

[¶ 36] In *Fortner*, 843 P.2d at 1143, this Court acknowledged that, "[i]t seems unjust to leave the burden of proving improper prosecutorial motive entirely with Appellant when the prosecution has nearly exclusive access to information on the reasons it failed to promptly bring charges." It was this concern that led the Court to adopt a test requiring the accused to make a prima facie showing of improper motive and then requiring the State to come forward with its reasons for the delay. This test, we said, takes into account the State's access to information while still placing the burden of proving both improper motive and prejudice on the accused. *Id.* at 1143–44. The Appellant's argument in this case does not persuade us to alter existing law on this issue.

[¶ 37] To show improper motive, Appellant alleged the prosecutor improperly used the criminal prosecution to settle family differences. She claimed the case was reopened after Jack Humhrey's sister, Bonnie Humphrey, was elected mayor in Evansville in 1998 and, as mayor, used her position to hire a police chief who would pursue criminal charges against Appellant. The difficulty with Appellant's argument is that regardless of Bonnie Humphrey's motive, the prosecutor who reopened the case produced substantial evidence from which a jury found Appellant guilty of second degree murder. Bonnie Humphrey's motive notwithstanding, Appellant produced no evidence that previous prosecutors had delayed bringing charges based upon an improper motive.

[¶ 38] Appellant likewise has not demonstrated actual prejudice to her case resulting from the delay. In the district court, she claimed that because of the delay the following evidence was no longer available:

● The testimony of her mother, Lois Ferris, who was 53 years old when Jack Humphrey was found dead from a gun shot wound and 80 years old at the time the State filed new charges against Appellant. Mrs. Ferris was the first person Appellant called on the morning of Mr. Humphrey's death. According to Appellant, the State claimed Mrs. Ferris helped hide evidence. Appellant claimed Mrs. Ferris' age and poor health made her unable to remember the events that occurred after Mr. Humphrey's death.

- The testimony of Helen Johnston, Appellant's aunt, who was deceased by the time the State refiled the charges. According to Appellant, the State claimed Mrs. Johnston reported that Appellant or Mrs. Ferris called her at 3:00 a.m. on November 23, 1977. Appellant alleged that Mrs. Johnston would have denied the State's claim.

- The testimony of Art Terry and Ron Ketchum, the detectives who investigated Jack Humphrey's death and who were deceased by the time new charges were filed. Appellant claimed they would have cast doubt on Bonnie Humphrey's testimony that she heard Appellant say, "God, what have I done?" and "Who will take care of my children now?" at the sheriff's office the morning of Jack Humphrey's death. She asserted the detectives would have testified that Bonnie Humphrey was not in the same room and could not have heard Appellant.

- The rifle the State alleged was used to shoot Jack Humphrey, which the prosecutor returned to Appellant in 1986 and was no longer in her possession when the charges were refiled. Appellant alleged "that the rifle is important evidence, and that improved technology would help show it was not [her] who fired it, and that it may not even be the instrument of Jack Humphrey's death."

- The files of Appellant's defense attorney and his investigator from 1977 to 1980, which no longer existed. Appellant alleged it was their investigation that led the circuit court to find insufficient probable cause and dismiss the charges in 1980. She alleged they did not remember what happened and "all of the evidence, information and material collected by them, including the identities of important witnesses are gone."

- The audiotape and complete transcript of the 1980 preliminary hearing, which no longer existed. She alleged "if we could hear [the tape], we could determine the good reasons [the county court judge] dismissed the case."

- The tape and transcript of the grand jury proceedings. She alleged "[t]hose records are probably important, at least because stories of the State's chief witnesses in providing an alleged motive" have changed over time.

- The X-ray of Jack Humphrey's head taken on the morning of his death. Appellant alleged the X-ray is "probably the best evidence of the bullet angle and, if available, would be examined by a qualified expert. That X-ray, if available, would likely show the track of the bullet and therefore the angle."

- Taped statements of Frank Finch and Larry Humphrey taken by investigators on November 23, 1977.

- The testimony of Gary Koschene who the State alleged was "involved" with Appellant. Appellant alleged that if he were available to testify, he would deny any involvement with her and dispute any involvement between her and Ron Akers.

- Jack Humphrey and Appellant's complete financial records for 1977 which Appellant alleged would show that they were not having financial difficulties by October and November of 1977, refuting the State's claim that her motive for killing her husband was financial difficulties.

[¶ 39] The State argues that Appellant's assertions of prejudice were speculative, vague, and unfounded because the missing evidence involved undisputed facts, matters established by other available evidence or matters not at issue. The State also asserts Appellant did not show the presentation of any of the unavailable evidence would have changed the outcome of her case. We agree.

[¶ 40] Appellant did not indicate what testimony Lois Ferris would have provided that she was unable to provide because of her age. Mrs. Johnston's testimony would not have been helpful because the State did not present evidence concerning a 3:00 a.m. phone call for her to refute. The testimony Appellant asserted detectives Terry and Ketchum allegedly would have given is speculative and, even if their testimony had been as she believed, would not likely have changed the outcome given the other evidence the State presented.

[¶ 41] Appellant made no effort to show what new technology existed by 2006 that

could have determined who fired the rifle or whether it was the weapon used. She identified no specific evidence from her attorney's files or the county court and grand jury tapes or transcripts that would have helped her defense. She did not indicate what she believed the X-ray would have shown about the path of the bullet nor did she suggest how having the X-ray would have been helpful in light of the 1977 autopsy report which indicated the bullet's path could not be conclusively identified because of the condition of Jack Humphrey's skull and the State's 2004 reconstruction of the skull which allowed experts to identify the entry point and approximate trajectory of the bullet.

[¶ 42] Appellant also made no showing as to how tapes of November 23, 1977, witness interviews would have been useful or how their unavailability actually prejudiced her defense. The testimony Appellant believes Mr. Koschene would have given was unlikely to have changed the outcome in light of the other evidence the State presented; therefore, Appellant has not shown actual prejudice from the absence of his testimony. What the absent financial records may have shown is speculation and, in any event, defense counsel had the opportunity to fully cross-examine the State's witnesses concerning the Humphreys' financial situation. Appellant has not shown actual prejudice from the incompleteness of those records.

[¶ 43] In sum, Appellant's argument is deficient in both aspects necessary to establish a due process violation based on the precharging delay. Our independent review of the record reveals no evidence indicating bad faith or improper motive on the part of the State, and we are not convinced Appellant was substantially prejudiced by the delay given the facts of this case. Both improper motive and actual prejudice must be shown in order to establish a due process violation. *Vernier*, 909 P.2d at 1345. Even if we were to conclude some prejudice resulted from the delay because evidence was unavailable, Appellant has not presented any evidence that the prosecutors delayed refiling the charges in order to gain a tactical advantage or due to some other improper motive. By itself, the fact 24 years elapsed between the dismissal of the original criminal case and the filing of the new murder charge does not establish a due process violation. *See Marion*, 404 U.S. at 325–26, 92 S.Ct. at 466. We therefore reject Appellant's claim.

### C. Evidentiary errors

*Standard of Review*

[¶ 44] Appellant claims the district court erred in admitting hearsay statements of the victim and certain financial records. Generally, decisions regarding the admissibility of evidence are entrusted to the sound discretion of the district court. *Law v. State*, 2004 WY 111, ¶ 14, 98 P.3d 181, 187 (Wyo.2004). We afford considerable deference to the district court's decision and, as long as a legitimate basis exists for the district court's ruling, it will not be reversed on appeal. *Id.* Under the abuse of discretion standard, our primary consideration is the reasonableness of the district court's decision. *Martin v. State*, 2007 WY 76, ¶ 20, 157 P.3d 923, 928 (Wyo.2007); *Wilde v. State*, 2003 WY 93, ¶ 13, 74 P.3d 699, 707 (Wyo.2003). The burden of establishing an abuse of discretion rests with the appellant. *Martin*, ¶ 20, 157 P.3d at 928.

[¶ 45] If we find that the district court erred in admitting the evidence, we must then determine whether or not the error affected Appellant's substantial rights, providing grounds for reversal, or whether the error was harmless. *See Skinner v. State*, 2001 WY 102, ¶ 25, 33 P.3d 758, 766–67 (Wyo.2001); W.R.A.P. 9.04; W.R.Cr.P. 52. The error is harmful if there is a reasonable possibility that the verdict might have been more favorable to Appellant if the error had never occurred. *Skinner*, ¶ 25, 33 P.3d at 767. To demonstrate harmful error, Appellant must prove prejudice under "circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play." *Id.* (quoting *Johnson v. State*, 790 P.2d 231, 232 (Wyo.1990)).

[¶ 46] To the extent no objection is made at trial to the evidence challenged on appeal, our review is limited to determining whether plain error occurred. We will not find plain error unless: (1) the record clearly reflects the error; (2) the party claiming the error demonstrates that a

clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way; and (3) the party proves that the violation adversely affected a substantial right resulting in material prejudice. *Lessard v. State*, 2007 WY 89, ¶ 14, 158 P.3d 698, 702 (Wyo.2007); *Cazier v. State*, 2006 WY 153, ¶ 10, 148 P.3d 23, 28 (Wyo.2006); *Ogden v. State*, 2001 WY 109, ¶ 9, 34 P.3d 271, 274 (Wyo.2001).

*Victim's statements*

[¶ 47] At trial, Bonnie Humphrey testified about a conversation she had with Jack the night of November 22. She testified that, during this conversation, Jack stated he had spent the day at Hilltop Bank trying to determine why checks were bouncing and why money was missing out of their account. Jack told her that he was going back to the bank on Monday and, if he found out Appellant, in fact, took the money and was responsible for their financial problems, he was going to throw her "ass out in the street," and keep the girls with him. Bonnie Humphrey testified that Jack was extremely upset and angry about the bank problems and Appellant's possible involvement in those problems.

[¶ 48] Appellant asserts this testimony constituted inadmissible hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.R.E. 801(c). Hearsay is inadmissible unless it falls within one of the exceptions contained in W.R.E. 803 or 804. W.R.E. 802.

[¶ 49] The State argues the statements were admissible under W.R.E. 803(3), which provides the following exception to the hearsay rule:

> *Then-existing mental, emotional, or physical condition.*—A statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it

relates to the execution, revocation, identification, or terms of declarant's will.

In support of admission of the statement under Rule 803(3), the State offers,[8] among other citations, the following quotation from a recognized legal authority:

> The exception is available when a nonparty's state of mind is significant. In many criminal trials, the state of mind of the alleged victim is important. What the victim said is often admissible to show his purpose, knowledge or mental state.

4 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 8:71, at 601–02 (3d ed.2007). The State contends the testimony to which Appellant objects showed the victim's then-existing state of mind—he was angry with Appellant about the problems at the bank and, if he learned that she was responsible for the missing money and checks, he intended to kick her out of the house and keep the children with him.

[¶ 50] We agree with the State. The testimony showed Jack Humphrey's then-existing state of mind and emotion (his intent, plan, design, and mental feeling). His state of mind was relevant because testimony from bank employees and others indicated Appellant knew he was upset about the missing money and believed she was responsible, and her knowledge of his state of mind may have affected her actions later that night. The fact that Appellant knew her husband was upset and believed she was responsible for the missing money distinguishes this case from *Schmunk v. State*, 714 P.2d 724, 740 (Wyo.1986), in which this Court concluded hearsay testimony that the victim intended to leave her husband was not admissible because there was no evidence that he knew about her intent. The district court did not abuse its discretion in admitting Bonnie Humphrey's testimony concerning the statements Jack Humphrey made to her on the night before he was killed.

*Financial Records*

[¶ 51] During the trial, various and numerous copies of records from Old Faithful

---

8. The State quoted from the second edition of this authority. We have elected to quote this passage from the most current version. There are only minor differences.

Life Insurance Company (Old Faithful), Hilltop Bank, and Guaranty Federal Savings and Loan Association (Guaranty Federal), consisting of, among other things, documents pertaining to Jack's life insurance policies, bank statements, loan records, and mortgage records, including delinquency notices, were received as evidence. The evidence apparently was admitted pursuant to W.R.E. 803(6),[9] the hearsay exception for "business records." Appellant contends it was error to admit this evidence because the evidence does not satisfy the requirements for admissibility under W.R.E. 803(6). Appellant also complains that the records are incomplete and, as such, their admission violated the "completeness" requirement of W.R.E. 106.[10] We note Appellant never objected at trial to the admission of the Hilltop Bank and Guaranty Federal records on these grounds. Accordingly, review of Appellant's complaints is a mix of plain error and abuse of discretion.

[¶ 52] Our review of this issue is inhibited by the global scope of Appellant's argument. Appellant muddles categories of documents together, failing to present any cogent argument regarding specific challenges to individual documents. Because of the overreaching nature of Appellant's argument, we are at a loss to find any basis in Appellant's argument for overturning the district court's determination of admissibility.

[¶ 53] Appellant's argument that the challenged documents should not have been admitted seems to revolve, in part, around her speculation that further documents existed that had not been discovered. Other aspects of her argument concern documents that were destroyed over time after the homicide and were no longer available at the time of trial. Appellant complains that the speculative and unavailable documents could have

changed the entire context of the admitted documents. Thus, it simply is not fair to have allowed admission of what she contends to be incomplete files. We disagree.

[¶ 54] Appellant's challenge mistakes admissibility with credibility. We know of no legal principle, nor has Appellant directed us to any, that would bar admissibility of standard business records based on the unavailability of related documents, particularly those whose very existence is purely a matter of conjecture. Indeed, this Court has determined just the opposite to be true:

> Without question, the complete records, unmarred by torn pages and missing segments, would have been more useful to the trial court than those records actually admitted. However, such discrepancies go to the weight rather than to the admissibility of the evidence. So long as the available records satisfied all of the safeguards set out in Rule 803(6), we cannot say that the trial court abused its discretion in admitting them into evidence.

*Matter of GP*, 679 P.2d 976, 999 (Wyo.1984).

[¶ 55] We need not further attempt to divine the nature of Appellant's remaining arguments on this issue since she has not argued, within the context of the facts of this case, that admission of the challenged records prejudiced her, even under a harmless error standard. Under the circumstances, we have no basis to conclude "there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had never occurred." *Skinner*, ¶ 25, 33 P.3d at 767.

---

9.  W.R.E. 803(6) states:
    *Records of regularly conducted activity.*—A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances or preparation

indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit[.]

10. W.R.E. 106 states:
    When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

## CONCLUSION

[¶ 56]  We have found no reversible error in our review of the record in this case in light of the applicable rules of law.  The judgment and sentence of the district court is affirmed.