2008 WY 132

**Zachariah Newton STRANGE, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**Nos. S–08–0026, S–08–0047.**

Supreme Court of Wyoming.

Nov. 13, 2008.

Representing Appellant: Diane M. Lozano, Wyoming State Public Defender; Tina N. Kerin, Appellate Counsel; Kirk A. Morgan, Senior Assistant Appellate Counsel. Argument by Mr. Morgan.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Graham M. Smith, Assistant Attorney General. Argument by Mr. Smith.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] A jury found the appellant guilty of unlawful delivery of methamphetamine, a felony. He was sentenced to imprisonment for a period of five to ten years. His motion for a new trial was later denied, and he appealed both the judgment and sentence and denial of the motion. We consolidated those appeals.

[¶ 2] We reverse and remand for a new trial because of prosecutorial misconduct.

## ISSUES

[¶ 3] The appellant raises two allegations against the State, one of prosecutorial misconduct and one of violating *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The second issue is moot, given our resolution of the first issue, which is stated as follows: Was the appellant denied his right to a fair trial due to prosecutorial misconduct when the prosecutor repeatedly asserted during opening statement and closing argument the need to protect the community from methamphetamine?

## STANDARD OF REVIEW

[¶ 4] Our standard of review for claims of prosecutorial misconduct is as follows:

Claims of prosecutorial misconduct are settled by reference to the *entire* record and hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial. Similarly, the propriety of any comment within a closing argument is measured in the context of the *entire* argument. A trial court's rulings as to the scope of permissible argument will not be disturbed absent a "clear or patent" abuse of discretion. Even then, reversal is

not warranted unless a reasonable probability exists, absent the error, that the appellant may have enjoyed a more favorable verdict.

*Arevalo v. State*, 939 P.2d 228, 230 (Wyo. 1997) (citations omitted; emphasis in original). An additional standard is applied, however, where there was no trial objection to the alleged misconduct:

[When the appellant did not object at trial], we review his claims by applying the plain error standard. *Lane v. State*, 12 P.3d 1057, 1064 (Wyo.2000). To demonstrate plain error, [the appellant] "must show that the record clearly shows an error that transgressed a clear and unequivocal rule of law which adversely affected a substantial right." *Taylor v. State*, 2001 WY 13, ¶ 16, 17 P.3d 715, [721] (Wyo.2001). Reversal of a conviction on the basis of prosecutorial misconduct, which was not challenged in the trial court, is appropriate only when there is "a substantial risk of a miscarriage of justice." *Capshaw* [*v. State*], 10 P.3d [560], 567 [ (Wyo.2000) ] (quoting *Dice v. State*, 825 P.2d 379, 384 (Wyo.1992)).

*Burton v. State*, 2002 WY 71, ¶ 13, 46 P.3d 309, 313–14 (Wyo.2002).

## FACTS

[¶ 5] On December 5, 2006, law enforcement officers orchestrated what is commonly called a "wired buy" in which a confidential informant, wearing a wireless transmitter/recorder, purchased methamphetamine from the appellant. The illegal exchange—$250.00 for one-eighth ounce of methamphetamine—took place at the appellant's apartment in Green River, Wyoming. The appellant was not immediately arrested because the officers wanted to use the confidential informant for additional transactions. He was, however, arrested and charged with this crime in May 2007.

## DISCUSSION

[¶ 6] This Court has frequently admonished prosecutors to seek convictions by presenting evidence of guilt, rather than

by arousing the passions and prejudices of jurors against societal evils.

> Arguments which are calculated to appeal to the jury's prejudice or passion are improper because they pose a risk that the accused may be convicted for reasons wholly irrelevant to his guilt or innocence. Accordingly, it is improper for a prosecutor to encourage the jury to convict a defendant in order to protect the community rather than upon the evidence presented at trial.

*Burton,* 2002 WY 71, ¶ 15, 46 P.3d at 314 (internal citations omitted). In *Gayler v. State,* 957 P.2d 855, 861 (Wyo.1998), we restated this precept in a drug-delivery case:

> The prosecutor's argument was obviously an appeal to the jury's sense of duty to help local law enforcement by convicting Gayler. The argument was improper because it appealed to the jury's passion and prejudice against drug-related crimes. Although a prosecutor is permitted a certain degree of latitude during closing arguments, he is not allowed to urge the jury to convict an accused on any basis other than that the evidence shows guilt beyond a reasonable doubt. *United States v. Barker,* 553 F.2d 1013, 1025 (6th Cir.1977).

 [¶ 7] We will review the entire trial—*voir dire,* opening statements, witness testimony, and closing arguments—to determine whether these clear lines were crossed. In cases such as this, the difference between an affirmance and a reversal is often the difference between an isolated comment and a concerted effort by the prosecutor to create prejudice in the jurors' minds based upon something other than the evidence. Statements made in opening and closing must be viewed in the context of the trial as a whole.

[¶ 8] The record in this case reveals the following questions and statements, many of which, standing alone, would perhaps not require reversal, but all of which, taken together, constitute just the type of community protection argument that we have condemned in the past:

1. During a pretrial conference, the prosecutor stated her intention of using during her opening statement a photograph of children walking near the appellant's apartment, to be accompanied by a statement about "what the crossing guard can't help them with or protect them from; a drug dealer selling a drug." The district court disallowed the statement, so it did not, in the end, prejudice the appellant, but it does reveal the tenor of the State's proposed approach to the case.

2. During *voir dire,* the prosecutor asked the prospective jurors whether they all agreed that the law prohibiting methamphetamine is a good law.

3. During her opening statement, the prosecutor said the following:

> Now, we talked on jury instructions—in jury selection this morning a little bit about methamphetamine. You all said that you're familiar with it, the devastating effects that it can have on people and the lives that it ruins. But if you think about it, did you have in your mind that it was dealt in dark alleys? Or the back of smoke-filled bars? Or in front seats of cars parked in out-of-way places. In this case, ladies and gentlemen, in broad daylight, residential street, right here in our community."

> . . . .

> Last December 5th, agents of the Southwest Drug Enforcement Team set up a sting operation on Zach Strange, in order to—to have—to bust at least one drug dealer and shut down his base of operation.

> You're going to hear from Arner Smart who is a Drug Enforcement Agent for Southwest Wyoming, a Division of the Criminal Investigation for the State of Wyoming. He's going to tell you about his job assignments and what the Enforcement Team does. He will tell you that one proven way to get rid of elicit [sic] controlled substances in our community is to use a confidential informant, or a CI, to do a drug transaction with a known drug dealer.

> . . . .

> And [the confidential informant] also told the officer, "And I think it's about

darn time we try to get rid of the meth problem in Sweetwater County."

4. During the direct examination of the State's primary law enforcement witness, the following exchanges occurred:

Q. And why was [the Southwest Wyoming Enforcement Team] created or established, Agent Smart?

A. To investigate crimes in narcotics nature.

. . . .

Q. And how many agents are stationed in Sweetwater County?

A. I believe there is [sic] five or six.

. . . .

Q. What do you do in—in order to try to curb the drug problem in this and other counties?

A. Interview people that are willing to give information, that are willing to go to work for us and assist us and—in the cases that we deal with.

Q. And what do you refer to those people as?

A. Confidential informants.

Q. Is that a common way of helping stem the drug tide in this county?

A. Yes.

. . . .

Q. What—I guess let me rephrase that. Is there a drug problem in Sweetwater County, Wyoming?

A. Yes, there is.

Q. Okay. And what's the primary drug that's the problem?

A. Methamphetamine.

Q. Okay. And what, exactly, in layman's terms, and I know you're not a scientist, but let's tell the jurors, if you would, what is methamphetamine and what effects does it have—

A. Methamphetamine is a stimulant, an upper. When people use it, they're very active or overactive. It's hard for them to think rationally, if you will, because their mind is racing at a higher rate than most people who aren't using the drug.

Q. Is it a common drug in an area such as ours where people do long hours of work?

A. Yes, it's very common. Oil field work, where people are constantly traveling from one area to another and have 20–hour days, it—it helps keep them awake so that they can accomplish putting in those hours and stuff of that nature.

Q. What are the effects—the physical effects that it can have on people?

A. Loss of weight, due a lot to the speeding up of the heart, and the faster that the heart's going, it tends to, I guess, burn more calories, if you will. They tend to—a lot of them tend not to shower or clean themselves or have good hygiene, so a lot of times they don't brush their teeth for weeks on end when they're using it because it's not in their mind to—to think about that stuff.

. . . .

Q. In the past in this county, I believe, methamphetamine labs or cooking meth was a problem. Is—will you explain what that is, first of all.

A. A meth lab is generally if someone is making their own meth lab, it entails—it's extensive on how you have to process it. It takes lots of ingredients, if you will, and a lot of that stuff is not as easy to get anymore as it was 10, 15 years ago. The precursors you can't buy in store in large quantities, and we've seen a dramatic drop in meth labs in the area in the last probably five to ten years.

Q. Okay. And have you seen a significant drop, then, in methamphetamine in general?

A. No, no. Just because the labs have ceased to exist, people are still transporting it into the state from out of state or out of the country.

Q. Where does—where are some of the places it does come from or what states or countries?

A. Primarily, the stuff that we generally see within the people that we talk to, the sources of methamphetamine will be from Utah, Colorado, Arizona, and a lot of those

are getting it from either Mexico or California and shipping it across—

. . . .

Q. Okay. And please explain to the jury those circumstances.

A. [The confidential informant] contacted myself and had informed me that, once again, he wanted to—to help out the community and try and do something about the drug problem. He said he—he knew of a gentleman in town that was selling a lot of drugs, and he said he would be willing to—to meet with this gentleman and do a controlled buy for us.

. . . .

Q. How many uses or how—how long would that last a person?

A. It varies on the—the user itself. If you have someone that uses several times a day, if they've been using drugs for a long period of time, an eight-ball might last them, you know, anywhere from three to four days, if that. Someone that's more of a recreational user, if you will, doesn't have to have it every day, isn't totally addicted, an eight-ball can last them a couple of weeks.

Q. And what are the different ways of ingesting methamphetamine into your system or your body?

A. You can smoke it.

Q. With what?

A. With a—they use a glass pipe. A lot of times they'll make their own with, like, glass cigar cases the cigars come in. They'll heat up the end and kind of blow out so it makes a bulb at the end of the glass piece, and they'll put a hole in it, and then they'll take the amount of meth or whatever, and they'll put it in that bowl part and use a lighter to heat it up, and they smoke it that way.

Q. Okay. And what other—what other ways?

A. You can snort it, if you want, you can eat it, people have been known to eat it or put it in capsules and swallow capsules so it gets ingested and goes through your body a lot slower, or you can use it intravenously with a needle.

5. During the direct examination of a second law enforcement officer, the following exchange occurred:

Q. How long has methamphetamine been around, if you're aware?

A. It became—it's been around for a long time, but it became very popular back—if I remember—well, it was used back—one of the methods of making it is the Nazi method.

Q. Why do we call it the "Nazi method"?

A. Because that's how they made it, and they gave it to their soldiers as a stimulant, so they would go more, to have more energy to go and fight.

Q. "They" being the German army?

A. Yes, the Nazi—yes, yes.

6. The following question and answer occurred during the direct examination of a third law enforcement officer witness:

Q. Why do you go to such length to disguise what you're doing?

A. The drug business is a really risky business, and we just have to be really careful with what we're doing.

7. The direct examination of the confidential informant included the following questions and answers:

Q. If you wanted to even today go and get methamphetamine, would that be pretty easy?

A. Very easy.

Q. You could leave this courtroom—how long would it take you to score?

A. Twenty minutes.

Q. Okay. And how would you go about doing that?

A. Go to a bar, club, night club or something.

Q. And—

A. And just ask about it, and they would—basically, we make—as long as I have the money.

Q. The money is the key?

A. Yep.

Q. Who would you approach if you saw one of these gentlemen in a bar? Would you approach them and ask them to score some meth?

A. No.

Q. How—how do you know who to approach?

A. Their eyes, the way they're dressed, the way they're looking around at you. You can just tell.

8. A fourth law enforcement officer testified as follows under direct, and then re-direct, examination:

[Prosecutor]: Your Honor, at this time, I would offer Agent Schmitt as an expert in the field of methamphetamine in Sweetwater County.

[Defense counsel]: No objection, your Honor.

Court: He'll so be designated.

[Prosecutor]: Thank you, your Honor.

Q. Agent Schmitt, can you guess at how many controlled buys you've done with CIs

A. I—I was actually thinking about that before trial, when you asked me before. Probably right between 2 and 300 would be my best guess.

. . . .

Q. Agent Schmitt, is Sweetwater County a target rich environment for methamphetamine trafficking?

A. It keeps us busy, yes.

Q. Where does it fit in relation to the rest of the state in terms of volume of cases that you generate?

A. Between us, the Gillette, Casper area, we run close but we're the busiest.

9. The prosecutor's closing argument contained the following comments:

[The confidential informant] put the—paid him and—and—excuse me. He paid him the money. He also told you that when he was inside the apartment, Zach Strange got several phone calls. You'll hear those. You'll have a chance to listen carefully to that. But he testified that in his opinion, he was talking to a couple of his drug dealers, talking about getting some more drugs to bring into this county to sell to our friends and neighbors.

. . . .

I was alarmed when one of the agents testified that Sweetwater County has the biggest meth problem in the state of Wyoming. I knew it was big, but I didn't know it was the biggest. There is a lot being done to deal with that problem. We have great agents here. We should be so proud that we have DCI agents that are helping us with that problem. And you will soon get to do your step. Is that going to eradicate the meth problem in our community? No, it won't. But it will be one less drug dealer out there selling meth to our friends and our families.

On voir dire when we were picking the jury, there was more than one person, I saw them out here, saying, "Meth has devastated my life. My daughter's on it. My friend's on it. My coworkers are on it." It is a horrible thing, and if we get even one drug dealer to quit from selling it, we're taking a step in the right direction.

I think back to the '50s when polio was a big problem. They started inoculating school children. Did the first shot—polio shot rid the country of polio? No, it didn't. But one shot led to another shot to another shot to another. Anymore, ladies and gentlemen, we hardly even hear of polio anymore.

That's what we can do by bringing drug dealers to trial. We can take one step, another step, another step, we can use confidential informants, we can have letter perfect buys, and we can bring people to trial, and we can hope to one day rid this county of this pervasive and horrible drug, and I hope you are going to be part of the solution. Thank you.

▇ [¶ 9] The type of community outrage or community protection theme that we disapproved in *Gayler* is rampant throughout these passages. It should be obvious to anyone familiar with the Wyoming Rules of Evidence that most, if not all, of the information presented is simply irrelevant to any of the issues being tried. How methamphetamine is manufactured is irrelevant. Where methamphetamine is manufactured is irrelevant. How methamphetamine is ingested is irrelevant. What effects methamphetamine has on the user is irrelevant. Whether Sweetwater County has a methamphetamine problem is irrelevant. Whether Sweetwater County has

a worse methamphetamine problem than Campbell County or Natrona County is irrelevant. Whether methamphetamine is easy to find or hard to find is irrelevant. And certainly, whether Nazi troops were high on methamphetamine is irrelevant.

[¶ 10] We are cognizant of the appellant's burden of showing plain error in this case, which showing must include proof of prejudice. In that regard, we conclude that the prosecutorial misconduct was so pervasive that we simply cannot be confident that the verdict rested in the evidence. It is not necessary to go back and discuss each of the above-quoted portions of the record to recognize that no part of the trial was unaffected by the overzealous prosecution. In the end, literally and figuratively, the jury was asked to become part of the solution to the drug problem by convicting the appellant.

## CONCLUSION

[¶ 11] Plain error occurred when the prosecutor repeatedly committed misconduct by seeking a conviction based upon community protection from the drug problem, rather than a conviction based upon the evidence.

[¶ 12] Reversed and remanded for a new trial.