2011 WY 2

**Donald J. BOUCHER, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–10–0029.

Supreme Court of Wyoming.

Jan. 4, 2011.

of conduct of delay. Our review of the record does not support this argument in any respect.

Representing Appellant: Diane M. Lozano, State Public Defender, and Tina N. Kerin Appellate Counsel, Wyoming Public Defender Program. Argument by Ms. Kerin.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Mi-

chael Pauling, Senior Assistant Attorney General; and Jenny L. Craig, Assistant Attorney General. Argument by Ms. Craig.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] Donald J. Boucher (the appellant) was convicted of six counts of sexual assault on a minor. He appeals from the Judgment and Sentence in that case claiming that his right to a speedy trial was violated, that the prosecutor committed misconduct, and that the district court abused its discretion in admitting certain evidence. Finding no reversible errors, we will affirm.

## ISSUES

[¶ 2] 1. Was the appellant's Sixth Amendment right to a speedy trial violated?

2. Did the prosecutor commit misconduct requiring a reversal of the appellant's conviction?

3. Did the district court abuse its discretion when it denied the appellant's motion for mistrial based upon the jury watching a redacted videotaped interview of the victim?

4. Did the district court abuse its discretion when it admitted "flight evidence"?

## FACTS

[¶ 3] The appellant was originally charged on February 15, 2001, by Information in Docket No. 29–853 with ten counts of second-degree sexual assault, each in violation of Wyo. Stat. Ann. § 6–2–303(a)(v) (LexisNexis 2001). An arrest warrant was issued for the appellant on the same day. Those crimes were allegedly committed in Cheyenne, Wyoming, while the appellant was living with his sister. At some point prior to being arrested for the above charges, the appellant moved to Arizona. The appellant was arrested under the warrant, in Arizona, but not until March 1, 2008. The record is unclear as to the reason for the seven-year delay between the issuance of the arrest warrant and the arrest of the appellant. In any case, the appellant pled not guilty and

his trial was originally set for June 2, 2008, but then rescheduled for September 8, 2008.

[¶ 4] On September 4, 2008, after questions were raised by the appellant's trial counsel as to the dates that the State claimed the crimes took place, the State filed a motion for continuance on the grounds that the State needed more time to investigate the exact dates of the alleged crimes. On September 4, 2008, the State requested permission to amend the Information to correct the dates, or to dismiss and re-file the charges, because the dates alleged in the Information were significantly incorrect. Not surprisingly, the defense opposed the State's request to be allowed to amend the Information or to dismiss the case without prejudice and re-file with the corrected dates. On September 18, 2008, the State filed a Motion for Dismissal, which motion was granted by the district court on September 22, 2008, dismissing the charges against the appellant without prejudice.

[¶ 5] On October 1, 2008, the appellant was charged by Information in Docket No. 30–066, with five counts of second-degree sexual assault, each in violation of Wyo. Stat. Ann. § 6–2–303(a)(v), and one count of third-degree sexual assault, in violation of Wyo. Stat. Ann. § 6–2–304(a)(iii) (LexisNexis 2001). The Information contained the corrected and more precise dates of the alleged crimes. The appellant pled not guilty and his trial was set for February 2, 2009, but was later rescheduled for April 6, 2009.

[¶ 6] On January 16, 2009, the appellant filed a Motion to Dismiss arguing that his right to a speedy trial, guaranteed to him by W.R.Cr.P. 48, the Wyoming Constitution, and the United States Constitution, had been violated. A hearing was held regarding the appellant's Motion to Dismiss, at which hearing the appellant's counsel argued that the delay from the time of the appellant's arrest until the time he was actually going to be brought to trial would violate his right to a speedy trial, and thus the charges against him should be dismissed. The district court determined that no speedy trial violation had occurred and denied the appellant's Motion to Dismiss. It is important to note that the appellant's trial counsel never raised the is-

sue of the delay between the time the original Information was filed in 2001 and the time of his arrest in 2008. The speedy trial claim associated with the Motion to Dismiss was based solely on the time from arrest until trial. More will be said about this below. The appellant went to trial on April 6, 2009, and was convicted by a jury of all six counts against him. The appellant was sentenced to 30 to '60 years incarceration. This appeal followed.

## DISCUSSION

### *Was the appellant's Sixth Amendment right to a speedy trial violated?*

 [¶ 7] The appellant argues that his right to a speedy trial was violated because 2,971 days passed from the time a warrant was issued for his arrest until the time of his trial.[1] We have repeatedly stated that we review *de novo* the constitutional question whether an appellant was denied his right to a speedy trial. *Humphrey v. State,* 2008 WY 67, ¶ 18, 185 P.3d 1236, 1243 (Wyo. 2008); *Strandlien v. State,* 2007 WY 66, ¶ 5, 156 P.3d 986, 989–90 (Wyo.2007); *Berry v. State,* 2004 WY 81, ¶ 17, 93 P.3d 222, 227–28 (Wyo.2004); *Warner v. State,* 2001 WY 67, ¶ 9, 28 P.3d 21, 26 (Wyo.2001).[2] Furthermore, "We review the district court's factual findings for clear error." *Humphrey,* 2008 WY 67, ¶ 18, 185 P.3d at 1243.

 [¶ 8] "The Sixth Amendment to the United States Constitution guarantees that the accused shall enjoy the right to a speedy and public trial." *Warner,* 2001 WY 67, ¶ 10, 28 P.3d at 26. The right to a speedy trial is a fundamental right and is binding on the states through application of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Barker v. Wingo,* 407 U.S. 514, 515, 92 S.Ct. 2182, 2184, 33 L.Ed.2d 101 (1972); *Klopfer v. North Carolina,* 386 U.S. 213, 223, 87 S.Ct. 988, 993, 18 L.Ed.2d 1 (1967). "[T]he protection of the Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution." *United States v. Marion,* 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971). Accordingly, the metaphorical clock for speedy trial purposes begins to tick at the time of arrest, information, or indictment, whichever occurs first. *Humphrey,* 2008 WY 67, ¶ 21, 185 P.3d at 1244; *Strandlien,* 2007 WY 66, ¶ 8, 156 P.3d at 990; *Campbell v. State,* 999 P.2d 649, 655 (Wyo.2000); *Wehr v. State,* 841 P.2d 104, 112 (Wyo.1992); *Harvey v. State,* 774 P.2d 87, 94 (Wyo.1989); *see also Doggett v. United States,* 505 U.S. 647, 655, 112 S.Ct. 2686, 2692, 120 L.Ed.2d 520 (1992); *United States v. MacDonald,* 456 U.S. 1, 6, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982); *Marion,* 404 U.S. at 320–21, 92 S.Ct. at 463–64.

 [¶ 9] To determine whether an accused has been denied his right to a speedy trial, we consider four factors: 1) the length of the delay; 2) the reason for the delay; 3) the defendant's assertion of his right; and 4) the prejudice to the defendant. *Strandlien,* 2007 WY 66, ¶ 6, 156 P.3d at 990; *Warner,* 2001 WY 67, ¶ 10, 28 P.3d at 26; *see also Barker,* 407 U.S. at 530, 92 S.Ct. at 2192. None of these factors are dispositive, rather the factors " 'must be considered together with such other circumstances as may be relevant.' " *Warner,* 2001 WY 67, ¶ 10, 28

---

1. The appellant concedes that his right to a speedy trial under W.R.Cr.P. 48 was not violated when the State dismissed the original charges, within 180 days from the time of his arrest, and then re-filed charges against him.

2. The State in this case argues that because the appellant failed to raise the issue of speedy trial below with regard to the pre-arrest delay that this Court should apply plain error analysis to that delay and review the post-arrest delay, which was raised below, *de novo.* We reject that argument because precedent mandates a *de novo* review with regard to the entire period of time: in this case, from the time the original Informa-

tion was filed charging the appellant until the trial began. *See Strandlien,* 2007 WY 66, ¶ 5, 156 P.3d at 989–90 (review of appellant's claim of a constitutional speedy trial violation notwithstanding failure on the part of the appellant to raise the issue below); *see also Barker v. Wingo,* 407 U.S. 514, 528, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972) (holding that a defendant who fails to demand a speedy trial does not waive that right; instead, a "defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right").

P.3d at 26 (quoting *Barker*, 407 U.S. at 533, 92 S.Ct. at 2193). The ultimate " 'inquiry is whether the delay in bringing the accused to trial was unreasonable, that is, whether it substantially impaired the right of the accused to a fair trial.' " *Warner*, 2001 WY 67, ¶ 10, 28 P.3d at 26 (quoting *Wehr*, 841 P.2d at 112). When a speedy trial violation has occurred, the charges must be dismissed. *Humphrey*, 2008 WY 67, ¶ 20, 185 P.3d at 1244. We will address each of the *Barker* factors below to determine the validity of the appellant's speedy trial claim.

### Length of the Delay

[¶ 10] This first factor is a threshold factor which requires a calculation of the length of delay in bringing the appellant to trial. *Strandlien*, 2007 WY 66, ¶ 7, 156 P.3d at 990. There is no precise length of delay that automatically constitutes a constitutional speedy trial violation. *Berry*, 2004 WY 81, ¶ 32, 93 P.3d at 231. "However, when the delay is so protracted as to be presumptively prejudicial, inquiry into the other factors is required." *Id.* As we noted above, the speedy trial clock begins to run at the time of arrest, information, or indictment, whichever occurs first. *See supra* ¶ 8. Once the right to a speedy trial has attached, that right "continues until the defendant is convicted, acquitted or a formal entry is made on the record of his case that he is no longer under indictment." *Berry*, 2004 WY 81, ¶ 32, 93 P.3d at 231 (quoting [4 Wayne R.] La-Fave, [Jerold H.] Israel[, & Nancy J.] King, [ ] *Criminal Procedure* § 18.1(c), [at] 670–71 [ (2d ed. 1999) ] ). If the State dismisses charges, and then re-files, the original date of the arrest, information, or indictment is still the controlling date for calculation purposes; however, the interim period between dismissal of charges and re-filing is not counted as long as the defendant is neither under arrest nor formally charged. *Id.; see also Strandlien*, 2007 WY 66, ¶ 8, n. 6, 156 P.3d at 990 n. 6. Moreover, " '[T]he periods of formal charge by a single sovereign for the same criminal act are tacked together even if the charges are different.' " *Humphrey*, 2008 WY 67, ¶ 21, 185 P.3d at 1244 (quoting *Strandlien*, 2007 WY 66, ¶ 8, 156 P.3d at 990).

[¶ 11] In the current case, the record reflects that the original Information charging the appellant was filed on February 15, 2001. The appellant was arrested on March 1, 2008. As mentioned above, following his arrest, the appellant did not go directly to trial. *See supra* ¶¶ 3–5. Instead, the State dismissed the original charges against the appellant and re-filed them with more specific dates regarding the alleged crimes. The order granting the State's motion to dismiss was filed on September 22, 2008. On October 1, 2008, the State filed a new Information charging the appellant. The appellant was finally brought to trial on April 6, 2009. The time between the filing of the original Information and when the appellant was finally brought to trial—excluding the time between the original charges being dismissed and being re-filed—totals 2,971 days. This delay greatly exceeds that which we have held meets the threshold requirement to be presumptively prejudicial and warranting further examination of the remaining speedy trial factors. *See Humphrey*, 2008 WY 67, ¶ 22, 185 P.3d at 1244 (561 days); *Strandlien*, 2007 WY 66, ¶ 9, 156 P.3d at 990 (762 days); *Sisneros v. State*, 2005 WY 139, ¶ 19, 121 P.3d 790, 797 (Wyo.2005) (349 days); *Berry*, 2004 WY 81, ¶ 34, 93 P.3d at 232 (720 days); *Warner*, 2001 WY 67, ¶ 12, 28 P.3d at 26 (658 days). Accordingly, we will examine the remaining factors.

### Reason for the Delay and Assertion of Right

[¶ 12] This case presents a slightly unique situation in that the appellant raised with the district court the issue of a speedy trial violation regarding only the post-arrest delay. It was not until this appeal that the appellant raised the issue of a potential speedy trial violation which also included the pre-arrest delay. As we stated above, the speedy trial clock begins to run at the time of arrest, information, or indictment, whichever occurs first. *See supra* ¶ 8. However, because the appellant only asserted a violation resulting from the post-arrest delay, our analysis with regard to the reason for the delay and assertion of right factors changes slightly. Because of this situation, we find it

appropriate to address the second and third factors together.

[¶ 13] The second factor requires us to examine the reasons for the delay, including which party was responsible for the delay in bringing the appellant to trial. *Humphrey*, 2008 WY 67, ¶ 23, 185 P.3d at 1244; *see also Wehr*, 841 P.2d at 112–13. Regarding this factor, we have said:

A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Wehr*, 841 P.2d at 112–13 (quoting *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192). We also determine which delays are attributable to the defendant and weigh those delays against the delays attributable to the State. *Strandlien*, 2007 WY 66, ¶ 10, 156 P.3d at 991. "Unquestionably, delays attributable to the defendant may disentitle him to speedy trial safeguards." *Berry*, 2004 WY 81, ¶ 35, 93 P.3d at 232. With regard to the third factor—assertion of one's right to a speedy trial—we have repeatedly held that to prevail on a speedy trial claim, one must not necessarily assert that right below. *Strandlien*, 2007 WY 66, ¶ 13, 156 P.3d at 991; *Berry*, 2004 WY 81, ¶ 45, 93 P.3d at 236. However, failure to assert the right to a speedy trial is weighted heavily against the appellant. *Id.*

[¶ 14] In this case, the appellant unquestionably asserted his right to a speedy trial on numerous occasions, which included filing a demand for speedy trial approximately a month after being arrested, and again following the dismissal and re-filing of charges, as well as filing a Motion to Dismiss based on speedy trial grounds. However, as noted above, at the hearing relating to the appellant's Motion to Dismiss, the appellant's trial counsel argued for dismissal on speedy

trial grounds, but only raised the issue of the post-arrest delay. The appellant's trial counsel did not raise the pre-arrest delay and, as a consequence, the district court never considered that delay in its *Barker* analysis. The problem on appeal is that the failure to raise that issue below resulted in no development of the facts and circumstances relating to the pre-arrest delay. It is true that the State carries the burden of proving that the delays in bringing the appellant to trial were reasonable and necessary. *Berry*, 2004 WY 81, ¶ 31, 93 P.3d at 231. However, because the appellant did not raise the pre-arrest delay with the district court, the State was not required to explain the reasons for that delay.[3] As to the post-arrest delay, the appellant did assert his right to a speedy trial and the record is fairly clear regarding the reasons for the delay during that period of time. During the hearing of the Motion to Dismiss, the prosecutor made the following statements relating to the post-arrest delay, specifically addressing the reason the State needed additional time to dismiss the original case and re-file charges:

As the Court mentioned, we did have discussions in chambers about the issues that came up while we were investigating the case. And there was [sic] some time frames that didn't seem to fit with the original Information that was filed in this matter. Again, we're relying on the recollection of a 9 year old—now an adult, a young lady—to try to get those time frames correct. So the reason for the delay, I think, is reasonable based upon the things that I've just mentioned.

[¶ 15] As a result of the appellant's failure to raise the pre-arrest delay with the district court, it is inappropriate automatically to attribute that portion of the delay to the State, mainly because we cannot be certain as to the reason for the delay. *See Strandlien*, 2007 WY 66, ¶ 11, 156 P.3d at 991 (A delay between indictment and arrest should not be weighted against or in favor of either party where the record is silent as to reason for the delay.). Regarding the post-arrest

3. The only thing in the record that indicates the reason for the pre-arrest delay is a statement by the prosecutor that the appellant was not located until the time of arrest.

delay, it is difficult to imagine how that delay could be attributed to anyone except the State. The delay was due largely to the fact that the State had the wrong dates of the alleged incidents and needed time to correct them, which included additional time to investigate. However, nothing in the record indicates that the delay was done for the purpose of hampering the defense. Moreover, we cannot say that the delay was not for a valid purpose; namely, corroborating the precise dates with the victim after nearly a dozen years had passed since the alleged incidents. Accordingly, this factor is neutral.

[¶ 16] Regarding the third factor—assertion of right—it has been stated that a defendant should not "be taxed for invoking his speedy trial right only after his arrest" where it was not shown that he was even aware that charges were pending against him prior to his arrest. *Doggett*, 505 U.S. at 654, 112 S.Ct. at 2691. However, we simply cannot ignore the fact that when the appellant asserted his right to a speedy trial below and complained of the post-arrest delay, he did not also raise the issue of the pre-arrest delay. *See Wehr*, 841 P.2d at 113 (Although assertion of the right to a speedy trial is not imperative for a successful speedy trial claim, "whether the right was asserted, and how vigorously," should be considered in determining the reasonableness for the delay.); *Campbell*, 999 P.2d at 656 ("[L]ess than vigorous assertions of the right to a speedy trial are given little weight. . . ."). Regarding the failure to assert one's right to a speedy trial, we have noted a distinction between cases where the defendant was represented by counsel and those where counsel was not involved. *See Wehr*, 841 P.2d at 114. In drawing a distinction between those cases, we stated that we give "less weight to a defendant's claim of deprivation when he failed to assert the speedy trial right while being advised by an attorney." *Id.* at 113. Because the appellant raised the issue of speedy trial with regard to the post-arrest delay, but failed to raise any issue with the pre-arrest delay, even though he was represented by counsel, at most we can only say that this factor slightly favors the appellant. We also note that in finding that this factor slightly favors the appellant, we find it signif-

icant that the post-arrest delay about which the appellant originally complained was slight in comparison to the pre-arrest delay which the appellant wholly ignored below.

### Prejudice

[¶ 17] This final factor focuses on the degree of prejudice that the appellant suffered as a result of the delay. *Humphrey*, 2008 WY 67, ¶ 28, 185 P.3d at 1245; *Strandlien*, 2007 WY 66, ¶ 14, 156 P.3d at 991. "We assess prejudice in light of the particular evils the speedy trial right is intended to avert: (1) lengthy pretrial incarceration; (2) pretrial anxiety; and (3) impairment of the defense." *Strandlien*, 2007 WY 66, ¶ 14, 156 P.3d at 991; *see also Barker*, 407 U.S. at 532, 92 S.Ct. at 2193. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193.

[¶ 18] The appellant does not point to any specific prejudice resulting from the delay, except to make a general statement that because he was incarcerated from the time of his arrest until the time of his trial that his finances, employment, and ability to associate "were clearly detrimentally impacted by the incarceration." The appellant also argues "that in cases of extreme delay prejudice should be presumed. . . ."

[¶ 19] It is likely true that the appellant's finances, employment, and ability to associate were impacted to some degree after he was arrested. However, there is no indication from the record that the pre-arrest delay, which is the bulk of the delay, caused any detriment to the defendant at all. In fact, we cannot tell from the record whether the appellant even knew about the charges prior to the arrest. This deficiency in the record is in part due to the fact that the appellant never raised the issue of the pre-arrest delay prior to this appeal. As a consequence, the only impairment of finances, employment, and ability to associate that we can assume actually occurred, was after the appellant was arrested, which was only 368 of the total 2,971 days. It is true that the appellant was

incarcerated from the time he was arrested until trial, which certainly weighs in favor of the appellant. *See Berry*, 2004 WY 81, ¶ 48, 93 P.3d at 237 (lengthy pretrial incarceration is a significant factor in determining prejudice). We also have no doubt that the appellant experienced pretrial anxiety, as most defendants experience in that situation. However, we cannot say that the appellant experienced an atypical level of anxiety; nor can we say that the appellant was incarcerated for such a lengthy period of time prior to trial that a finding of substantial prejudice is automatically warranted. *See Campbell*, 999 P.2d at 656 (Anxiety is typically present with pretrial incarceration, so to prevail an appellant "must demonstrate that she suffered prejudice in an extraordinary or unusual manner."); *Wehr*, 841 P.2d at 114 (refusal to find prejudice when appellant failed to demonstrate "that he suffered prejudice in any extraordinary or unusual manner"); *Berry*, 2004 WY 81, ¶ 49, 93 P.3d at 237 (finding a violation of speedy trial, in part, because appellant was incarcerated for 720 days prior to trial). Furthermore, we cannot say that the appellant's defense was impaired as a result of the delay. In fact, the delay in this case may have actually benefited the appellant's defense. Had the delay not occurred, the victim's memory regarding the actual dates of the assault may not have been hazy and no dismissal and re-filing of charges would have been necessary. The fact that the victim did change the dates actually provided the appellant with ammunition with which to cross-examine the victim, which otherwise may not have been available. We also reiterate that the appellant has not pointed to any specific prejudice that occurred in this case and, due to the uniqueness of this particular case relating to the pre- and post-arrest delays and lack of a record relating to the former, we refuse to presume that substantial prejudice occurred as a result of the delay. *See Strandlien*, 2007 WY 66, ¶ 15, 156 P.3d at 991 ("Under the circumstances of this case, we do not find that the delay, alone, reached a point where we can say there was a probability of substantial prejudice. Therefore we decline to relieve [the appellant] of his burden of proving actual prejudice.").

[¶ 20] Having thoroughly reviewed and analyzed all four of the *Barker* factors, we cannot say that the appellant's right to a speedy trial was violated. While the pre-arrest delay was significant, the appellant failed to raise that portion of the delay below resulting in an insufficient record to determine its reason and who was responsible for it. The record is much clearer regarding the post-arrest delay, but that delay was only 368 days, which we cannot say was for an invalid purpose or that the appellant suffered any specific and substantial prejudice therefrom. Consequently, although the 2,971 days of delay seems extreme on its face, in this particular case, we cannot say that the appellant's right to a speedy trial was violated.[4]

### *Did the prosecutor commit misconduct requiring a reversal of the appellant's conviction?*

[¶ 21] The appellant alleges several instances of prosecutorial misconduct. We have said the following regarding claims of prosecutorial misconduct:

Claims of prosecutorial misconduct are settled in reference to the entire record and hinge on whether a defendant's case has been so prejudiced that the defendant did not have a fair trial. *Arevalo v. State*, 939 P.2d 228, 230 (Wyo.1997). The propriety of a closing argument is considered in the context of the entire argument. *Id.* Reversal is warranted when a reasonable possibility exists that, absent the error, the

---

4. We reiterate the uniqueness of this particular case and note that under other circumstances, 2,971 days could likely be a violation of an accused's right to a speedy trial. However, without a sufficient record indicating the reason for the pre-arrest delay, which was the majority of the overall delay, as well as the other issues noted above, we cannot attribute that delay to anyone or find prejudice as a result. *Cf. Doggett*,

505 U.S. at 657–58, 112 S.Ct. at 2694 (finding a speedy trial violation after a 8½ year delay from the time of indictment until the time the appellant was brought to trial, where the issue was raised with the trial court, allowing the Supreme Court to review the record and find that the government was negligent in attempting diligently to prosecute the case during the period of delay).

appellant may have enjoyed a more favorable verdict. *Id.*

*Campbell,* 999 P.2d at 663. Furthermore, "[t]he appellant bears the burden of establishing prejudicial error." *Smith v. State,* 2009 WY 2, ¶ 26, 199 P.3d 1052, 1060 (Wyo. 2009) (quoting *Gabbert v. State,* 2006 WY 108, ¶ 21, 141 P.3d 690, 697 (Wyo.2006)). We apply a plain error standard of review to those claims of misconduct where there was no contemporaneous objection at trial. *Strange v. State,* 2008 WY 132, ¶ 4, 195 P.3d 1041, 1043 (Wyo.2008). In that regard, we have said:

> [When the appellant did not object at trial], we review his claims by applying the plain error standard. *Lane v. State,* 12 P.3d 1057, 1064 (Wyo.2000). To demonstrate plain error, [the appellant] "must show that the record clearly shows an error that transgressed a clear and unequivocal rule of law which adversely affected a substantial right." *Taylor v. State,* 2001 WY 13, ¶ 16, 17 P.3d 715, [721] (Wyo.2001). Reversal of a conviction on the basis of prosecutorial misconduct, which was not challenged in the trial court, is appropriate only when there is "a substantial risk of a miscarriage of justice." *Capshaw [v. State* ], 10 P.3d [560], 567 [ (Wyo.2000) ] (quoting *Dice v. State,* 825 P.2d 379, 384 (Wyo.1992)).

*Strange,* 2008 WY 132, ¶ 4, 195 P.3d at 1043 (quoting *Burton v. State,* 2002 WY 71, ¶ 13, 46 P.3d 309, 313–14 (Wyo.2002)). We will address each of the alleged instances of prosecutorial misconduct below.

**Voir dire**

[¶ 22] W.R.Cr.P. 24(c)(2) provides:

> The court shall not permit counsel or a *pro se* defendant to attempt to precondition prospective jurors to a particular result, comment on the personal lives and families of the parties or their attorneys, nor question jurors concerning the pleadings, the law, the meaning of words, or the comfort of jurors.

The appellant argues that during *voir dire* the prosecutor violated W.R.Cr.P. 24(c)(2) several times. The appellant's arguments relating to the alleged misconduct during *voir dire* can be classified into two general categories: (1) comments by the prosecutor about his personal life and apologizing to the jury for the words he had to use during the trial that may be offensive or embarrassing, in order to ingratiate himself with the jury; and (2) interfering with the appellant's trial counsel's attempts at speaking with the victim's mother. We will address each of these general arguments below.

**1. Comments about the prosecutor's personal life**

[¶ 23] The alleged violations of W.R.Cr.P. 24(c)(2) included the prosecutor telling the jury that he was the "number two" in the district attorney's office, that he had the "crud" and as a result had to use cough drops and cold medicine which may be affecting his thought process, that when he was in college he was struck by a drunk driver making it difficult for him to sit in one place for long periods of time, and that his wife thought his money was hers.

[¶ 24] There were no objections to any of the above comments at trial, thus we will review them for plain error. *Strange,* 2008 WY 132, ¶ 4, 195 P.3d at 1043. The first prong of plain error is satisfied, because the record does clearly reflect the alleged misconduct. As to the second prong—whether a clear and unequivocal rule of law has been violated—regarding W.R.Cr.P. 24(c)(2), we have previously stated, "[T]he limitations placed on voir dire by the Wyoming Rules of Criminal Procedure are flexible, and purposely so, so as to allow the trial court discretion in that important process." *Person v. State,* 2004 WY 149, ¶ 33, 100 P.3d 1270, 1286 (Wyo.2004).

[¶ 25] While the way the prosecutor phrased some of his statements is questionable, and necessary information could have been presented differently to avoid any notions of impropriety, a review of the record demonstrates that the prosecutor's comments were not intended to ingratiate himself with the jury. For instance, the prosecutor's comment regarding being "the number two" in the district attorney's office was followed up by "But I always have to make sure I've introduced myself, because at some point I'm

going to ask you who all of you know." While it may not have been necessary to explain the specific position that the prosecutor held at the district attorney's office, the comment was relatively benign and really did not tell the jurors much more than they already knew (i.e. that the prosecutor was from the district attorney's office). Similarly, when the prosecutor mentioned having a cold and needing to take cough drops as a result, those statements were nothing the jurors were not already likely aware of through their own personal observations. We also note that at least with regard to the alleged misconduct relating to the prosecutor mentioning his wife, the appellant's trial counsel also made a comment about her ex-husband during *voir dire*. Clearly wide latitude was being given to both sides during *voir dire*. It would be difficult for this Court to hold the State accountable for comments which were similar to comments made by the appellant's counsel. *See Metzger v. State*, 4 P.3d 901, 910 (Wyo.2000) (noting that defense counsel asked similar questions to that which appellant now claims were error for the prosecutor to ask). Additionally, the appellant does not point us to any case law that would suggest that these comments violate W.R.Cr.P. 24(c)(2) *per se*. The appellant also makes no specific showing of prejudice regarding any of these comments. In addition, the appellant argues that the prosecutor attempted to ingratiate himself with the jury when he made a series of comments in which the prosecutor apologized for some of the graphic comments, words, or statements he would have to use in this case that may offend members of the jury. We reject the appellant's argument because a review of the record indicates that the prosecutor made these statements and then asked whether or not the members of the jury would hold such potentially offensive comments against the State. The prosecutor's comments were intended to ferret out any bias that the jurors may develop as a result of the potentially offensive words or phrases that the State would naturally be required to say in a sexual assault case and therefore we do not find the prosecutor's comments in that regard to be misconduct.

[¶ 26] One of the prosecutor's comments is more troubling, perhaps, than the others. In explaining to the jury why he had trouble sitting down for long periods of time, and in an effort to transition to a question about whether any jurors had medical issues which may prevent them from serving on the jury, the prosecutor stated, "Now, when I was in college, I was struck by a drunk driver, and one of the things I learned was, over the years, especially the older I got, the more it was difficult for me to sit in one position for long periods of time." While the relevance of this comment is questionable, the statement was limited and brief, and the appellant makes no specific showing of prejudice relating to the comment, so we cannot say that plain error occurred. *See Teniente v. State*, 2007 WY 165, ¶ 10, 169 P.3d 512, 520 (Wyo. 2007) ("[T]he defendant bears the burden of proving prejudice" relating to claims of prosecutorial misconduct.). Consequently, the appellant has failed to prove plain error relating to these comments.

## 2. Interference with attempts to speak with the victim's mother

[¶ 27] The final claim of prosecutorial misconduct allegedly occurring during *voir dire* arises out of an incident where the appellant's trial counsel attempted to speak with the victim's mother in the hallway outside the courtroom and the prosecutor interfered with that conversation. Although it is slightly difficult to grasp exactly what the appellant is arguing in this regard, it appears that the gist of the argument is that the prosecutor conveyed to the jury that he in no way represented the victim or had a duty to her, but then attempted to interfere with the appellant's trial counsel's attempts to speak with the victim's mother. Even assuming this allegation is true, it is unclear how the prosecutor's actions violate W.R.Cr.P. 24(2)(c). The appellant fails to provide any cogent argument or cite to any legal authority regarding this argument and accordingly we will not further address the appellant's arguments as they relate to purported violations of W.R.Cr.P. 24(2)(c). *Rolle v. State*, 2010 WY 100, ¶ 33, 236 P.3d 259, 273 (Wyo. 2010) (quoting *Forbis v. Forbis*, 2009 WY 41, ¶ 10, 203 P.3d 421, 424 (Wyo.2009)) ("We

have 'consistently refused to consider claims not supported by cogent argument or citation to pertinent legal authority.' ").

[¶ 28] The appellant also argues, however, that the above-described conduct violates the ABA Standards for Criminal Justice Prosecution and Defense Function, Standard 3–3.1 Investigative Function of Prosecutor (3d ed. 1993). That standard provides: "d) A prosecutor should not discourage or obstruct communication between prospective witnesses and defense counsel. A prosecutor should not advise any person or cause any person to be advised to decline to give to the defense information which such person has the right to give." This issue was raised with the district court following the above-described events. It is unclear exactly what the appellant is requesting this Court to review: he offers no standard of review, nor does he make any argument relating to how the events prejudiced him. The record reveals that the district court offered a solution to the appellant's complaint, which included waiting until the victim's mother was called as a witness and then asking her if she wanted to speak with the appellant's trial counsel and, if so, whether she wanted to do it in private or with someone from the district attorney's office present. There is no indication in the record whether the appellant's trial counsel heeded the district court's advice and requested to speak with the victim's mother again when she was called as a witness. As a result, we have no means by which to determine whether the alleged misconduct was cured by the actions of the district court. Even assuming arguendo that the appellant's trial counsel was not allowed to meet with the victim's mother, the appellant makes no showing of prejudice. Consequently, the appellant's arguments must fail. *See Strange,* 2008 WY 132, ¶ 4, 195 P.3d at 1043 (quoting *Arevalo v. State,* 939 P.2d 228, 230 (Wyo.1997)) ("Claims of prosecutorial misconduct are settled by reference to the *entire* record and hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial."); *see also Teniente,* 2007 WY 165, ¶ 10, 169 P.3d at 520 ("[T]he defendant bears the burden of proving prejudice" relating to claims of prosecutorial misconduct.).

**Improper cross-examination of the defense expert**

 [¶ 29] The appellant argues that the prosecutor committed misconduct by making a series of improper hearsay statements on cross-examination of Dr. Denison, the appellant's expert witness, in an attempt to impeach the expert's truthfulness and the credibility of his expert opinion. Specifically, the appellant claims that the prosecutor violated the hearsay rule and the appellant's right to confront witnesses against him when the prosecutor asked Dr. Denison whether it would surprise him that the prosecutor spoke with specific people at the places with which Dr. Denison claimed to be affiliated and they said Dr. Denison was not affiliated with them. The following exchange occurred during Dr. Denison's cross-examination:

Q. [By Prosecutor] Okay. So this wasn't necessarily like an interviewing thing, it doesn't sound like.

A. [By Dr. Denison] No. This was—see, it's the Reid Academy—or the Reid Institute, and they have a yearly or twice yearly set of presentations for investigators. So there are a number of different issues on that.

Q. Does "trouble in the workplace, detecting poison personnel" sound familiar?

A. Right. That was the name of it.

Q. So that was what you presented?

A. Right.

Q. So it was about workplace situations. And you said you're a member of the Reid Institute?

A. Yes.

Q. Are you familiar with Joseph P. Buckley of the Reid Institution?

A. No. Mark Reid is the person who invited me to come and did the first training that I was in.

Q. And, interestingly enough, we contacted the Reid Institute, sir. Would it surprise you to know that they say you're not a member?

A. Yes, that would surprise me to hear that. Yes, that definitely surprises me to hear that.

Q. Would it you [sic] surprise you—

(Reporter interruption.)

Q. [By Prosecutor] Would it surprise you to know that—you say you've attended a three-day basic course and a one-day advanced course on the Reid technique of interviewing in 2005 as well as two other Reid courses?

A. [By Dr. Denison] That would be right, yes, because I've done the Reid courses more than once.

Q. Would it surprise you to hear that they say, "Mr. Denison has never been authorized to teach the Reid technique of teaching and interrogation?"

A. Oh, I'm not certified to teach the Reid technique of interviewing and interrogation, and I'm sure I did not represent myself to be a teacher of the Reid technique of—

Q. And your current resume says you're a member of the Reid Institute.

A. Yes.

Q. And would it also surprise you—

(Reporter interruption.)

Q. [By Prosecutor] Would it also surprise you that they said, "It appears Mr. Denison joined the Reid Institution, an association made of primarily people who have attended our interviewing and interrogation class, in 2005 but did not renew his membership thereafter?"

A. [By Dr. Denison] That surprises me to hear that.

Q. Okay. Let's talk about some of your other affiliations there, sir. One of them I noticed was the Academy Group you talked about specifically. You're associated with them?

A. Associated as in I've been trained by them.

. . . .

Q. According to Martin Rehberg, who is the director of that institute, he says that you're not a member, and it would be inaccurate to say that you're affiliated with them.

Let's talk about the Association of Threat—let's see if I get this right—Association of Threat Assessment Profession-als. That's the membership out of California started by law enforcement agencies?

A. Yes.

Q. And you said—

A. I've had—

Q. I want to—

THE COURT: Hold on. Hold on. One at a time, please. Your question, [prosecutor]?

Q. [By Prosecutor] I want to make sure I heard you. You're involved in Colorado?

A. [By Dr. Denison] Yes, sir.

Q. Okay. And that would be—the current president is Gary Hickox?

A. Yes.

Q. Would it surprise you to know I spoke to ATAP today, the Association of Threat Assessment Professionals? I spoke to Justin at their office. He says you're not affiliated with them.

A. That surprises me as well, because that is—that is an affiliation that requires sending in a yearly amount of money—

Q. Sure.

A. —unlike—

Q. So you just—

THE COURT: Wait a minute. Let him finish his answer.

A. [By Dr. Denison]—unlike AGI. And I'm not sure where you're going with this, but I certainly think using the word "affiliation" is appropriate.

Q. [By Prosecutor] They didn't seem to think so.

[Defense Counsel]: Your Honor, argumentative, improper.

THE COURT: Yeah. The remark made by [the prosecutor] is stricken. The jury's instructed to disregard it.

Let's move to the next question, please.

Q. [By Prosecutor] I have no further questions of this witness, Your Honor.

[¶ 30] Because the appellant did not object at trial to the questions he now complains were prosecutorial misconduct, we will review them for plain error. *Teniente*, 2007 WY 165, ¶ 10, 169 P.3d at 520; *see also Stokes v. State*, 2006 WY 134, ¶ 6, 144 P.3d 421, 423 (Wyo.2006) (constitutional questions

which are not raised below are reviewed for plain error). The alleged misconduct is clearly reflected in the record, as indicated by the above quoted portions of the transcript. As to the second prong of the plain error analysis—whether a clear and unequivocal rule of law was violated—the appellant argues that the prosecutor violated W.R.E. 802 by introducing hearsay statements. W.R.E. 802 provides, "Hearsay is not admissible except as provided by these rules or by other rules adopted by the Supreme Court of Wyoming or by statute." The appellant claims that no exceptions to the hearsay rule were offered and none exist. Additionally, the appellant argues that by introducing the hearsay statements the prosecutor violated the appellant's right to confrontation, as provided by the Wyoming Constitution, article I, section 10 and the Sixth Amendment to the United States Constitution, because the people that purportedly made the statements were not called as witnesses, nor were they identified to the defense prior to trial to allow the defense to call them. Furthermore, the appellant argues that "the prosecutor improperly inserted himself, and by extension, his credibility as a respected member of the legal system, into the cross-examination of Dr. Denison."

[¶ 31] In response, the State argues that the questions were proper as cross-examination of collateral matters under W.R.E. 608(b), and that that rule only precluded the prosecutor from seeking to introduce extrinsic evidence relating to the collateral matter of Dr. Denison's credentials. W.R.E. 608(b) provides in relevant part as follows:

(b) *Specific instances of conduct.*—Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. . . .

We are inclined to agree with the State in this particular situation. We have held that wide latitude should be granted in the cross-examination of expert witnesses. In that regard, we have said the following:

Having offered his expert opinion the expert witness exposes himself to interrogation which ordinarily would have no place in the cross-examination of a factual witness, but the expert exposes himself to the most searching kind of investigation into his qualifications, the extent of his knowledge and the reasons for his opinion, including the facts and other matters upon which it is based. The cross-examiner can raise any subject fairly designed to test his expertise whether touched upon in his direct testimony or not.

*Chrysler Corp. v. Todorovich*, 580 P.2d 1123, 1133 (Wyo.1978) (citations omitted). By taking the stand as an expert, Dr. Denison opened himself up to the kinds of questions that the prosecutor asked. The questions were consistent with W.R.E. 608(b), in that they related to a collateral matter, but were designed to cross-examine Dr. Denison in regard to his character for truthfulness or untruthfulness, and the bases of his opinions. Consequently, we cannot say that the prosecutor violated a clear and unequivocal rule of law. Therefore, the appellant has failed to prove plain error.

**Other alleged instances of prosecutorial misconduct**

[¶ 32] The appellant raises a number of additional instances of alleged prosecutorial misconduct, including identifying witnesses as defense witnesses, speaking too loudly at side bar conferences in order to allow the jury to hear what was being said, eliciting victim impact testimony, and improper use of W.R.E. 404(b) evidence during closing argument. However, the appellant's arguments relating to these issues are deficient in a number of ways, including failing to make any cogent arguments as to the alleged misconduct, failing to cite to pertinent legal authority, and, most significantly, failing to demonstrate or even discuss, in most instances, how the alleged misconduct prejudiced the appellant. We have repeatedly held that

we will not address issues that are unaccompanied by cogent argument or citation to pertinent legal authority. *See Rolle*, 2010 WY 100, ¶ 33, 236 P.3d at 273 (quoting *Forbis*, 2009 WY 41, ¶ 10, 203 P.3d at 424) ("We have 'consistently refused to consider claims not supported by cogent argument or citation to pertinent legal authority.'"); *see also Teniente*, 2007 WY 165, ¶ 10, 169 P.3d at 520 ("[T]he defendant bears the burden of proving prejudice" relating to claims of prosecutorial misconduct.). Consequently, we will not further address these issues.

### Did the district court abuse its discretion when it denied the appellant's motion for mistrial based upon the jury watching a redacted videotaped interview of the victim?

[¶ 33] The appellant argues that the district court abused its discretion when it denied the appellant's motion for mistrial based on the district court's admission of a redacted videotaped interview of the victim. The crux of the appellant's argument is that he believed that based on earlier conversations the entire videotape was going to be played to the jury but, once most of it had been played in court, the prosecutor objected to some of the content on the remainder of the videotape. The portions objected to by the prosecutor were then redacted by order of the district court. The appellant claims that the only reason he made the decision to play any part of the videotape, which contained unfavorable material, was because he thought the prosecutor and district court were going to allow him to play the videotape in its entirety. The appellant then moved for mistrial based on the grounds just described, which motion was denied. More of the facts regarding this issue will be discussed below.

[¶ 34] "We review the denial of a motion for mistrial for an abuse of discretion." *Yellowbear v. State*, 2008 WY 4, ¶ 66, 174 P.3d 1270, 1295 (Wyo.2008). "[A]n abuse of discretion occurs where the district court could not have reasonably concluded as it did. It is important to remember that there is a distinction between the role of this Court and the role of the district court in regard

to" a motion for mistrial. *Id.* at ¶¶ 66–67, at 1295 (citations omitted).

> The district court is not applying a standard of review when it determines the motion. Rather, in the case of a motion for mistrial, the district court is governed by the following principles:
>
>> Granting a mistrial is an extreme and drastic remedy that should be resorted to only in the face of *an error so prejudicial that justice could not be served by proceeding with trial.*
>
> (Emphasis added.) *Warner v. State*, 897 P.2d 472, 474 (Wyo.1995).

*Id.* at ¶ 67, at 1295.

[¶ 35] The appellant implies that at the time when the videotape was initially accepted into evidence, it was clear to the appellant, his counsel, the prosecutor, and the judge that the whole videotape would be played for the jury and no further objections would be forthcoming. However, the record does not support this scenario. The district court did a thorough job of discussing the possible issues relating to the admission of this videotape. We will not quote the entire transcript pertaining to this issue, but we will note that this issue was discussed for approximately twenty pages of transcript, wherein the district court made clear that notwithstanding the potentially harmful things that the jury may see and hear on the videotape that the appellant still wanted to play it. The record is clear that the reason the appellant initially wanted to play the videotape is because the defense's strategy was to claim that the victim's testimony was influenced by the victim witness coordinator and the videotape helped prove that, because it allegedly contained inconsistencies in the victim's story. Prior to playing the videotape, the appellant's trial counsel requested that a portion of the videotape, which contained a statement regarding the appellant's prior sexual assault conviction, be redacted. The district court and prosecutor agreed that that should occur. The following colloquy demonstrates, in part, that the appellant had notice not only of the dangers of playing the videotape, but also that the only objection that the prosecutor was waiving regarding the videotape was the order in which it was being

played, but was explicitly reserving his right to make further objections regarding the substance and content of the videotape:

[By Appellant's Counsel]: Your Honor, on behalf of [the appellant] and with his involvement in this, we do request that the tape be played except for that one reference, that one area referenced by Ms. Gavagan to some other conduct, and we believe that we can redact that off of this pretty easily. We're just talking about one area, that one reference that would need to be—

. . . .

[By Appellant's Counsel]: And, Your Honor, what I would do, I would certainly give [the prosecutor] notice by tomorrow morning if there's something more that we would want to redact and have the Court make a determination as to whether that's appropriate or let the Court know if there is something else that we're intending to redact. . . .

The objection that I don't want to have is that it should have been dealt with at the time of cross as opposed to on our case, and it sounds like they're not going to object to us doing it. . . .

. . . .

[By The Prosecutor]: . . . And with that ruling from the Court, we would make no such objection as to the timeliness of her playing it at that point. If she's going to play it in her case in chief, I'm not going to say that she should have done that when [the victim] was on the stand. I won't make any objection along those lines.

. . . .

[By Prosecutor]: Your Honor, not having really thought this through, I'll just put on the record what my thought process is regarding my tentative statements. I promised that I will not object during their case in chief that she should have done this during [the victim]'s cross-examination.

. . . .

. . . I may have another objection that may come to mind, but it certainly won't be because [the victim] won't be there to—

. . . .

I don't have some trick or trap in mind to keep it out because of what they're doing now. I may get a light bulb that says this shouldn't come in because of this reason, and I don't want to be precluded from it, but it won't be because [the victim] isn't on the stand.

THE COURT: We can cross that bridge when we come to it.

[¶ 36] During the appellant's case-in-chief, the videotape was played. With approximately 20 minutes remaining in the video, the prosecutor objected on relevancy grounds regarding certain portions of the video. Specifically, the prosecutor objected to playing portions of the videotape that discussed the victim's prior contacts with law enforcement when she was a juvenile, and a portion discussing issues the victim had with her mother which also addressed the victim's sexual history. The district court agreed to further redact the videotape to exclude the additional objectionable content. In response, the following colloquy occurred:

[By Appellant's Counsel]: The other concern that I have—and it's a fairly large concern, Your Honor—is that when you asked me to make sure with my client and had me go through the particular determination and strategy as to whether this tape should be used—and for the record, this is the tape that's provided to us by the State. It's their evidence that they gave us in discovery.

I had played the tape for my client. He was present when we had discussions about what would and would not be on the tape. We asked that the entire tape come in. The State was fine with that. You indicated that you were concerned because there was something in it you [sic] that you felt you'd heard that was going to be so prejudicial that you had concerns about whether that should simply be redacted. We agreed that, yes, that needs to be redacted. We found one other reference to prison, which we informed the Court of when we got here this morning, as well as the bathroom break that we felt could be removed from it.

My concern at this point, quite honestly, is that my client—that this was a—that in

terms of strategy, this was not an easy determination to make on behalf of my client. I indicated this morning that my client had been involved in talking with me about that.

And one of the things—one of the things that—one of the factors, obviously, and strong factors, that he took into account was that the entire tape—because there's much prejudicial information against him in it, but he felt that overall to have the jury hear everything that was going to be on that tape, that he decided strategywise [sic] with me that would be to his benefit.

THE COURT: I understand that, but to the extent that I thought that I was going to allow you to play something that was improper, I never would have allowed you to ask a witness that question. You may not have advised your client properly.

. . . .

. . . I think common sense would tell you that you would not allow that kind of information to come before the jury. It doesn't relate to the reasons that it's being played.

The appellant then moved for a mistrial, which was denied. In denying the appellant's motion for mistrial, the district court stated:

THE COURT: I think everything that you played so far you made a choice to play. And the portions that I'm not going to allow are so clearly improper that if there was any hope that that would be heard by the jury, it was pretty unrealistic. And in addition, nothing's happened at this point that I think would so erode the fabric of this trial that it would require a mistrial. So I'm going to deny that motion.

[¶ 37] The appellant is essentially requesting that this Court reverse the district court's denial of his motion for mistrial based on the district court's refusal to admit inadmissible evidence. As demonstrated above, the appellant was not tricked into playing the videotape. The appellant made a conscious decision to play the videotape knowing the risks. The prosecutor explicitly reserved his right to object to admission for any reason other than the order in which the tape was played. As the district court pointed out, the information the appellant intended to present

to the jury is generally inadmissible and it should not have come as any surprise to the appellant that the district court prohibited him from showing those portions of the video. *See* W.R.E. 609(d) ("Evidence of juvenile adjudications is generally not admissible under this rule."); and Wyo. Stat. Ann. § 6–2–312 (LexisNexis 2009) (governing the admission of sexual history evidence of sexual assault victims). Consequently, we cannot say that the district court abused its discretion in denying the appellant's motion for mistrial.

[¶ 38] In the alternative to arguing that the district court abused its discretion by denying his motion for mistrial, the appellant argues that his trial counsel was ineffective for initially introducing the video and believing that every portion of the video would be played, and therefore the remedy should be a new trial. In order to prevail on an ineffective assistance of counsel claim, the appellant

must demonstrate on the record that counsel's performance was deficient and that prejudice resulted. *Strickland* [*v. Washington*], 466 U.S. [668,] 687, 104 S.Ct. [2052,] 2064, 80 L.Ed.2d 674 [ (1984) ]; *Starr* [*v. State*, 888 P.2d 1262,] 1266 [ (Wyo.1995) ] [*overruled on other grounds by Jones v. State*, 902 P.2d 686, 691 (Wyo. 1995) ]; *King v. State*, 810 P.2d 119, 125 (Wyo.1991) (Cardine, J., dissenting); *Campbell v. State*, 728 P.2d 628, 629 (Wyo. 1986); *Frias* [*v. State* ], 722 P.2d [135,] 145 [ (Wyo.1986) ]. In other words, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to "render such assistance as would have been offered by a reasonably competent attorney" and that "counsel's deficiency prejudiced the defense of [the] case." *Lower v. State*, 786 P.2d 346, 349 (Wyo.1990). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064.

*Chapman v. State,* 2001 WY 25, ¶ 6, 18 P.3d 1164, 1168–69 (Wyo.2001) (quoting *Grainey v. State,* 997 P.2d 1035, 1038–39 (Wyo.2000)).

[¶ 39] Although the district court prohibited the appellant's counsel from showing portions of the videotape, the original purpose for which counsel sought to play the videotape was not frustrated: i.e. to show inconsistencies in the victim's stories from which to draw an inference supporting the defense's theory that the victim witness coordinator had influenced the victim. We have repeatedly stated that we will not second guess trial tactics. *Schreibvogel v. State,* 2010 WY 45, ¶ 48, 228 P.3d 874, 890 (Wyo. 2010). Furthermore, the appellant points us to no specific prejudice that the appellant suffered as a result of his trial counsel's decisions. As a result, we cannot say that counsel rendered ineffective assistance to the point that we cannot trust that a just outcome resulted.

### Did the district court abuse its discretion when it admitted "flight evidence"?

[¶ 40] The appellant's final claim of error is that the district court abused its discretion when it allowed the State to present evidence that the appellant attempted to flee when authorities in Arizona went to his house to arrest him. Specifically, the appellant argues that the district court abused its discretion in admitting the flight evidence because the evidence was introduced in order to show the appellant's guilty conscience, but the State was not required first to prove that the appellant did in fact have a guilty conscience when he fled. We review decisions regarding the admissibility of evidence for an abuse of discretion.

A trial court's decision on the admissibility of evidence is entitled to considerable deference, and will not be reversed on appeal unless the appellant demonstrates a clear abuse of discretion. As long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal.

*Phillip v. State,* 2010 WY 14, ¶ 10, 225 P.3d 504, 509 (Wyo.2010) (internal quotation marks and citations omitted) (quoting *Wim-*

*bley v. State,* 2009 WY 72, ¶ 10, 208 P.3d 608, 611 (Wyo.2009)).

[¶ 41] We dealt with the issue of admission of flight evidence in *Cureton v. State,* 2003 WY 44, 65 P.3d 1250 (Wyo.2003). In *Cureton,* a police officer pulled over a car in order to arrest one of the occupants who was believed to have been involved in a theft of property from the American Legion. *Id.* at ¶ 3, at 1251. However, before the officer could make the arrest, the appellant fled. *Id.* The officer was eventually able to catch up to the appellant and placed him under arrest. *Id.* Property belonging to a couple who were victims of a home burglary was later discovered in the car from which the appellant had fled. *Id.* at ¶ 4, at 1251. The appellant was charged with petit larceny relating to the American Legion incident and burglary relating to the property taken from the victims' home. *Id.* at ¶ 5, at 1251. The appellant pled guilty to the larceny incident involving the American Legion, but pled not guilty to the burglary charge. *Id.* at ¶ 5, at 1252. At trial on the burglary charge, the State presented the evidence of the appellant's flight when the police officer attempted to arrest him, in order to show the appellant's guilty conscience. The appellant was convicted of burglary following a jury trial. *Id.* On appeal, the appellant argued that the evidence relating to his flight from the police officers was improperly admitted into evidence because it did not show a guilty conscience regarding the property stemming from the burglary, because his flight was actually in response to the American Legion incident and not the burglary incident. *Id.* at ¶ 8, at 1252. In rejecting the appellant's arguments, we stated:

The State is not required to prove the purpose of appellant's flight. Rather, it is up to the jury to fairly draw reasonable inferences as to the purpose of appellant's actions. Even though it is possible to draw other inferences from the evidence presented, the jury has the responsibility to resolve conflicts in the evidence. This [C]ourt will not substitute its judgment for that of the jury.

*Id.* at ¶ 12, at 1253 (internal citations omitted).

[¶ 42] In the case *sub judice*, the appellant attempts to distinguish *Cureton* from the facts surrounding his flight and arrest by arguing that in *Cureton* there was a showing of consciousness of guilt relating to at least some crime, but here there was no such showing. In fact, the appellant argues that for flight evidence to be admissible there must be some evidence linking the appellant's flight with the reason the State is presenting the flight evidence. The appellant's arguments are misplaced. We made clear in *Cureton* that the State is not saddled with the burden of proving the purpose of the appellant's flight. 2003 WY 44, ¶ 12, 65 P.3d at 1253. It is up to the jury to make that determination and we will not second guess the jury's determination in that regard. *Id.* Accordingly, the district court did not abuse its discretion in admitting the evidence of the appellant's flight.

### CONCLUSION

[¶ 43] We cannot say that the appellant's speedy trial right was violated, in large part because he failed to raise the issue regarding the pre-arrest delay with the district court and therefore failed to create a sufficient record for our review. Furthermore, the appellant failed to demonstrate any abnormal or substantial prejudice beyond that which would be expected from any defendant awaiting trial. We also reject the appellant's arguments relating to prosecutorial misconduct. It has not been shown that the prosecutor was attempting to ingratiate himself with the jury via the challenged comments, and as a result the prosecutor did not violate W.R.Cr.P. 24(c)(2). Additionally, the district court did not abuse its discretion when it denied the appellant's motion for mistrial based on admission of the redacted videotape, because the State reserved its right to object, and because admission of the redacted portions of the tape would have violated state statutes. Finally, we find that the district court did not abuse its discretion in admitting evidence of the appellant's flight.

[¶ 44] Affirmed.