# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 102

OCTOBER TERM, A.D. 2016

_October 24, 2016_

GABRIEL AUGUSTINE TATE,

**Appellant**
**(Defendant),**

**v.**

S-16-0006

**THE STATE OF WYOMING,**

**Appellee**
**(Plaintiff).**

_Appeal from the District Court of Sweetwater County_
_The Honorable Nena James, Judge_

_Representing Appellant:_
Office of the State Public Defender: Diane Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; David E. Westling, Senior Assistant Appellate Counsel. Argument by Mr. Westling.

_Representing Appellee:_
Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Caitlin F. Young, Assistant Attorney General; Joshua C. Eames, Assistant Attorney General. Argument by Mr. Eames.

_Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ._

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1]    A jury found Gabriel Tate guilty of numerous counts of first degree sexual assault, of battery, and of unlawful contact without bodily injury.  He appeals those convictions, claiming that certain statements he made while in custody should have been suppressed because of a *Miranda* violation.  He also contends that he was not provided a speedy trial. We affirm.

## ISSUES

[¶2]    1.  Did the district court err in denying Tate's motion to suppress statements he made to a nurse during a sexual assault examination?

2.  Was Tate denied a speedy trial as required by W.R.Cr.P. 48 and the Sixth Amendment to the United States Constitution?

## FACTS

[¶3]    Because the facts surrounding the sexual assault are not pertinent to this appeal, we will provide only a brief summary of the terrible event.  A woman ("E.W.") invited Tate to her house one evening while he was passing through Rock Springs.  They had previously met when Tate was dating E.W.'s friend, and after that they kept in contact through social media.  While their time at E.W.'s house began affably, by the evening's end E.W. had been threatened, choked, beaten, urinated on, and sexually violated in various ways.  Tate documented his sadistic behavior by taking pictures throughout the incident with a cell phone and sending them to others.  After he left, E.W. called police and reported the incident.

[¶4]    Tate was arrested on June 17, 2014.  Before being interviewed by law enforcement while in custody, he was read his *Miranda* rights, and he was also provided a document setting forth those rights and a waiver of them.  Tate stated that he understood his rights, orally agreed to waive them, and signed the waiver.  He then spoke with three separate law enforcement officers about the incident.[1]

[¶5]    Approximately three hours after he had been read his *Miranda* rights and law enforcement interviews began, Tate was transported to the local hospital for an examination to obtain biological samples pursuant to a search warrant.  At the hospital, Tate signed a written consent form that confirmed that he agreed to participate in the examination, that he understood the evidence being collected could be used in a potential criminal prosecution, and that he could refuse any portion of the examination.

---

[1] Tate does not raise any issue with respect to his statements to law enforcement during these initial interviews.

[¶6]    After he signed the consent form, a sexual assault nurse examiner began the examination.  At the beginning, she asked Tate a few open-ended questions—basically why he was there for an examination and why a police officer was present.  Tate later volunteered incriminating statements about the incident with E.W.  He indicated that he had played head games with her to get her to have sex with him, that he had threatened her that he had family who would hurt her if she didn't have sex or said anything afterward, and that he was "ex-military and a bad ass."[2]  A police officer was present for the examination, but did not participate in the discussion.

[¶7]    On June 19, 2014, the State filed an information charging Tate with four counts of first degree sexual assault, one count of kidnapping, and one count of unlawful contact without bodily injury.  A public defender was appointed the same day.  Tate waived his right to a preliminary hearing on June 24, and the matter was bound over to the district court. The next day, June 25, his attorney filed Tate's first demand for a speedy trial.  Arraignment in the district court was scheduled for June 30.

[¶8]    When Tate appeared for arraignment, his attorney expressed concerns about his client's competency and fitness to proceed, and requested that proceedings be stayed pending an evaluation by the Wyoming State Hospital.  The district court agreed to enter an order for the requested examination, and instructed defense counsel that the order should require the evaluation to be done within thirty days.[3]  Because of the concerns about his fitness to proceed, Tate was not arraigned.  This was quite proper, because the court had no way of knowing if Tate could enter a knowing and voluntary plea without the benefit of an evaluation.

[¶9]    Unfortunately, roughly three months passed before Tate's attorney filed the required written motion for an order for the evaluation and suspension of proceedings on September 24, 2014.[4]  The district court granted that motion two days later, ordered the competency examination to be conducted at the Wyoming State Hospital, and suspended proceedings pending the completion of the examination and the resulting report.

---

[2] The presentence investigation indicates that Tate never served in the military.

[3] Wyo. Stat. Ann. § 7-11-303(a) (LexisNexis 2015) provides that if there is reasonable cause to believe that the accused has a mental illness or deficiency which renders him unfit to proceed, "all further proceedings shall be suspended."  Section 7-11-303(b) provides that if the order provides for commitment to a designated facility, "the commitment shall continue no longer than a thirty (30) day period …."

[4] The record indicates that the delay in filing the request was due to the fact that his attorney did not initially comply with the statutory requirements to obtain an evaluation of his fitness to proceed.

[¶10]  The state hospital evaluated Tate on December 23, 2014, and submitted a report finding him fit to proceed on January 8, 2015.[5]  On February 11, 2015, Tate was arraigned and pled not guilty to all charges.  On the same day, he filed a second demand for speedy trial.  Trial was set for April 7, 2015.

[¶11]  A hearing was held on February 20 concerning the State's intent to offer W.R.E. 404(b) evidence of a prior alleged sexual assault, and the district court entered an order which is not challenged in this appeal.  However, during that hearing, there was discussion about the State obtaining transcripts from a proceeding against Tate in a different state.  On March 16, the State requested that the trial date be continued to allow prosecutors more time to track the transcripts down.  The district court agreed to the request and reset the trial for July 6, 2015.  The defense did not object to the continuance.

[¶12]  On April 1, 2015, the State moved to amend the information to include an additional eight counts arising from the incident with E.W.  It proposed to add five additional counts of first degree sexual assault and two counts of battery.  The district court held a hearing on the motion and allowed the amendment, and the State filed the amended information on May 29.

[¶13]  Tate moved to suppress the statements he made to the nurse during the examination following his arrest a week before trial.  He alleged, *inter alia*, that his rights under *Miranda v. Arizona* had been violated.  A suppression hearing was held the next day, and the district court denied the motion.  It reasoned that the statements were admissible because: (1) the nurse was not acting as an agent of the police as she was following independent medical protocols and procedures; and (2) Tate had been previously advised of his Miranda rights by law enforcement and had waived those rights just hours before he spoke with her.

[¶14]  A four-day jury trial began on July 6, 2015.  On July 9, the jury returned a verdict of guilty on all counts, except one kidnapping charge.  The district court sentenced Tate to eight to twenty years in prison on each of the nine first-degree sexual assault counts, with all to be served consecutively.  With regard to the misdemeanor counts, he was also sentenced to six months in jail for the two battery charges and the unlawful contact without bodily injury charge, to be served concurrently with the sentences for the felony sexual assault charges.[6]  Judgment and sentence was entered on August 11, 2015.

[¶15]  Tate timely perfected this appeal.

---

[5] The record does not reveal why nearly two months passed from the time the hospital received the district court's order requiring an evaluation to when Tate was actually evaluated.  We can only speculate that there may not have been room for him at the appropriate unit of the hospital until then.
[6] Tate was given credit for 405 days of time served.

**DISCUSSION**

*1. Suppression of Incriminating Statements*

[¶16]  Tate asserts that the sexual assault nurse examiner violated his *Miranda* rights when she asked him questions, after which he made incriminating statements.  He therefore claims that the district court erred in denying his motion to suppress those statements.

[¶17]  When this Court reviews a district court's ruling on a motion to suppress evidence, it will not interfere with findings of fact unless they are clearly erroneous.  *Gunn v. State*, 2003 WY 24, ¶ 5, 64 P.3d 716, 719 (Wyo. 2003).  If there have not been specific findings of fact set out, we will uphold the district court's ruling if it is supportable by any reasonable view of the evidence.  *Id.*  The evidence is considered in the light most favorable to the district court's ruling because of its ability to evaluate the credibility of the witnesses, weigh the evidence, and make any necessary inferences, deductions, and conclusions.  *Id.*  However, the voluntariness of a defendant's statements and whether a particular search and seizure was unreasonable are questions of law that we review *de novo*.  *Id.*; *State v. Deen*, 2015 WY 5, ¶ 6, 340 P.3d 1036, 1039 (Wyo. 2015).

[¶18]  A suspect's statements during a custodial interrogation are admissible at trial, provided that certain advisements are given.  *Gunn*, ¶ 7, 64 P.3d at 719 (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).  If statements are made during a custodial interrogation without *Miranda* rights first being provided, they must be excluded.  *Gunn*, ¶ 7, 64 P.3d at 719. (citing *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)).  The United States Supreme Court has said:

> Accordingly, we laid down "concrete constitutional guidelines for law enforcement agencies and courts to follow." Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as "*Miranda* rights") are: a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

*Dickerson*, 530 U.S. at 435, 120 S.Ct. at 2331 (citations omitted) (quoting *Miranda*, 384 U.S. at 442, 479, 86 S.Ct. at 1611, 1630); *Gunn*, ¶ 7, 64 P.3d at 719-20.  "Custodial

interrogation means 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Gunn*, ¶ 8, 64 P.3d at 720 (quoting *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612). "Neither general on-the-scene questioning as to facts surrounding a crime nor statements volunteered freely without compelling influences are considered to fall within this definition." *Gunn*, ¶ 8, 64 P.3d at 720 (citing *Miranda*, 384 U.S. at 477-78, 86 S.Ct. at 1629.

[¶19] There is no dispute that Tate was in custody during the examination at the hospital, and the State concedes this point. Whether the nurse's questions at the beginning of her examination amounted to an interrogation, as Tate contends they did, is much more debatable. It is also highly questionable whether the nurse was an agent of law enforcement for *Miranda* purposes. However, we need not address those questions, because there is another avenue by which Tate's first issue can readily be resolved. He was fully advised of his *Miranda* rights only three hours before the examination, and that advisement remained in effect during the examination.

[¶20] In *Mitchell v. State*, this Court explained "[t]he mere passage of time does not compromise a *Miranda* warning, and courts have generally rejected a per se rule requiring automatic re-advisement following a time delay." 982 P.2d 717, 722 (Wyo. 1999). We pointed out that "[s]everal courts have upheld the sufficiency of *Miranda* warnings where several hours have elapsed between the reading of the warning and the interview or confession." *Id.* (citing numerous cases). Accordingly, we went on to conclude that the *Miranda* warnings given to the defendant approximately eleven hours before he was interrogated remained valid and re-advisement was not required. *Id.* at 721-22; *see* 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.8(b) (4th ed., Dec. 2015 update) ("It is generally accepted that fresh warnings are not required after the passage of just a few hours.").

[¶21] The brief time between Tate's sexual assault examination and the *Miranda* warnings, although there was a change in location from the police station to the hospital, did not require Tate to be fully re-advised of the Miranda warnings. *See* 2 LaFave, *supra,* § 6.8(b) ("Even when the passage of time has been fairly brief, consideration must be given to changes in the circumstances in the interim. However, the courts have generally taken the position that new warnings are not required just because there has been a change in the locale of the interrogation . . . ."). Tate was taken directly from the Sweetwater County Sheriff's office, where he had been arrested and *Mirandized*, to the hospital for the express purpose of obtaining biological samples pursuant to a warrant.[7] A law enforcement officer was present during his interaction with the female nurse, for obvious reasons. A rationale person could not believe that he was no longer in jeopardy

---

[7] It is doubtful that law enforcement would agree with the language in the hospital's exam form that Tate could refuse to provide the samples after a search warrant for them had issued.

and that the content of the *Miranda* warnings no longer applied at that point. The change in location was therefore immaterial, and the district court properly denied Tate's motion to suppress the statements he made to the nurse.

## 2. *Speedy Trial*

[¶22] Tate contends that his right to a speedy trial under both W.R.Cr.P. 48(b) and the Sixth Amendment to the United States Constitution was violated. Our standard of review for such claims is *de novo*. *Castellanos v. State*, 2016 WY 11, ¶ 48, 366 P.3d 1279, 1294 (Wyo. 2016).

### 2.1. *W.R.Cr.P. 48*

[¶23] Wyoming's Rules of Criminal Procedure provide a procedural mechanism for enforcing a defendant's constitutional right to a speedy trial. W.R.Cr.P. 48(b); *see Castellanos*, ¶ 49, 366 P.3d at 1294. A criminal charge must be brought to trial "within 180 days following arraignment unless continued as provided in this rule." W.R.Cr.P. 48(b)(2). "Calculating the 180-day provision of Rule 48 is a simple matter of arithmetic, beginning with arraignment and ending with commencement of trial, excluding any time periods specified in the rule." *Castellanos*, ¶ 49, 366 P.3d at 1294 (quoting *Ortiz v. State*, 2014 WY 60, ¶ 33, 326 P.3d 883, 892 (Wyo. 2014)).

[¶24] Tate was arraigned in the district court on February 11, 2015, after his evaluation for fitness to proceed was completed. His trial began on July 6, 2015. By straightforward arithmetic, a total of 145 days elapsed between arraignment and the start of trial. This period falls well within the requirements of Rule 48.

### 2.2. *Sixth Amendment*

[¶25] Turning to the question of whether Tate's Sixth Amendment constitutional right to a speedy trial was violated, this Court has explained:

> The Sixth Amendment guarantees every criminal defendant a speedy trial. For its constitutional speedy trial analysis, this Court adopts the four-factor test articulated [by the United States Supreme Court] in *Barker v. Wingo* . . . . The *Barker* test requires balancing (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant. No individual factor is dispositive. The ultimate inquiry is whether the delay in bringing the accused to trial was unreasonable, that is, whether it substantially impaired the right of the accused to a fair trial.

*Castellanos*, ¶ 69, 366 P.3d at 1299 (citations and quotation marks omitted); *see also Lafferty v. State*, 2016 WY 52, ¶ 44, 374 P.3d 1244, 1252 (Wyo. 2016).

### *Length of Delay*

[¶26]  As to length of delay, it is a threshold factor which requires a calculation of the delay in bringing the appellant to trial. *Miller v. State*, 2009 WY 125, ¶ 39, 217 P.3d 793, 805 (Wyo. 2009). "In calculating the delay under a constitutional analysis, the speedy trial clock begins to run at the time of arrest, information, or indictment, whichever occurs first." *Lafferty,* ¶ 45, 374 P.3d at 1252 (quotation marks omitted). "The right to a speedy trial continues until the defendant is convicted, acquitted or a formal entry is made on the record of his case that he is no longer under indictment." *Castellanos*, ¶ 70, 366 P.3d at 1299 (quotation marks omitted); *Ortiz*, ¶ 40, 326 P.3d at 893.

[¶27]  Applying these principles, Tate's speedy trial clock commenced on June 17, 2014, the date when he was arrested.  He was convicted on July 9, 2015. A total of 387 days elapsed between the arrest and conviction.

[¶28]  This Court's precedent establishes that further analysis of all the *Barker* factors is warranted when the delay approaches a year from arrest or charge to trial. *See, e.g., Rhodes v. State*, 2015 WY 60, ¶ 18, 348 P.3d 404, 411 (Wyo. 2015) (351 days); *Mascarenas v. State*, 2013 WY 163, ¶ 12, 315 P.3d 656, 661 (Wyo. 2013) (332 days); *Potter v. State*, 2007 WY 83, ¶ 35, 158 P.3d 656, 665 (Wyo. 2007) (362 days); *Large v. State*, 2011 WY 159, ¶ 26, 265 P.3d 243, 250 (Wyo. 2011) (363 days); *Sisneros v. State*, 2005 WY 139, ¶ 19, 121 P.3d 790, 797 (Wyo. 2005) (349 days); *Whitney v. State*, 2004 WY 118, ¶ 40, 99 P.3d 457, 471 (Wyo. 2004) (374 days); *Springfield v. State*, 860 P.2d 435, 451 (Wyo. 1993) (319 days); *Wehr v. State*, 841 P.2d 104, 112 (Wyo. 1992) (320 days).  This point in time is consistent with federal case law. *See Doggett v. United States*, 505 U.S. 647, 652 n.1, 112 S.Ct. 2686, 2691 n.1, 120 L.Ed.2d 520 (1992). ("[P]ostaccusation delay [is] presumptively prejudicial at least as it approaches one year."); *cf. Durkee v. State*, 2015 WY 123, ¶ 13 n.2, 357 P.3d 1106, 1111 n.2 (Wyo. 2015) (noting that "[t]he Tenth Circuit Court of Appeals uses one year as a touchstone for distinguishing between 'ordinary' and 'presumptively prejudicial' delays in bringing a criminal defendant to trial."); *See* 5 LaFave, *supra,* § 18.2(b) (collecting cases on point).

[¶29]  We note that while a delay approaching one year will generally trigger consideration of all the *Barker* factors, there may be instances where the nature and complexity of a case warrant their consideration even though the delay is less than a year. *See Osborne v. State*, 806 P.2d 272, 277 (Wyo. 1991) (301 days).  In *Barker*, the United States Supreme Court explained:

7

[T]he length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.

407 U.S. at 530-31, 92 S.Ct. at 2192; *see also* 5 LaFave, *supra,* § 18.2(b).

[¶30]  Since the delay of 387 days in this case amounts to more than one year, all of the *Barker* factors must be balanced.  We note that the phrase "presumptive prejudice" used in *Barker* and restated by many courts, including this one, simply means that all the *Barker* factors must be analyzed.  *See Durkee*, ¶ 13 n.2, 357 P.3d at 1111 n.2; *see also Doggett*, 505 U.S. 647, 652 n.1, 112 S.Ct. at 2691 n.1 ("We note that, as the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." (citations omitted)); *State v. Garza*, 212 P.3d 387, 396 (N.M. 2009) ("[A] 'presumptively prejudicial' length of delay is simply a triggering mechanism, requiring further inquiry into the *Barker* factors.").

[¶31] In applying the length of delay to the *Barker* enquiry, the longer the delay, the more likely it is that the first factor will weigh in the defendant's favor. *Doggett*, 505 U.S. at 652, 112 S.Ct. at 2691.  The delay in this case, however, barely crosses the "bare minimum needed to trigger judicial examination of the claim." *Id*.  Consequently, the first factor does not weigh in Tate's favor.

### ***Reason for Delay***

[¶32]  Regarding the second factor of the *Barker* analysis, our role is to determine who or what was responsible for the delay. *Ortiz*, ¶ 42, 326 P.3d at 893.  We recently reaffirmed:

Delays attributable to the defendant may disentitle him to speedy trial safeguards. Delays attributable to changes in defense counsel, to the defendant's requests for continuances, and to the defendant's pretrial motions are all considered delays attributable to the defense. With respect to the prosecution, a deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.

*Id.* (internal citations and quotation marks omitted).

[¶33]  The record is quite clear that a hefty portion of the pretrial delay was caused by the fitness evaluation Tate's attorney requested. *See supra* ¶¶8-9.  A total of 192 days

transpired from the time his counsel orally requested the evaluation and the hospital filed its report with the district court. The first three months of that period were consumed by Tate's counsel getting the proper written request and proposed order filed with the district court. Then the jail where Tate was being held did not receive the district court's order until about a month later, at which time the order was faxed to the State Hospital under the procedures used in Sweetwater County. It is unclear who dropped the ball there. Tate was examined approximately two months after that, and the report regarding his fitness to proceed was then filed a half-month later. We cannot tell with any certainty why the evaluation was not completed in thirty days as the court had ordered.

[¶34] After subtracting the delay caused by the fitness proceedings, 195 days remain. The record indicates that these delays were partly the result of routine calendaring issues by the district court. The delay was also caused by two unopposed continuances sought by the State due to a transcript request and scheduling conflict of a witness. This Court has explained that "[a] more neutral reason such as . . . overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Potter*, ¶ 36, 158 P.3d at 665. However, these delays hardly qualify as "deliberate attempts to delay the trial in order to hamper the defense." *Ortiz*, ¶ 51, 326 P.3d at 895. Defense counsel's failure to timely file a proper motion and proposed order for an evaluation led to further unexplained delays that we are unwilling to attribute to the State or district court. Ultimately, in weighing the delays attributable to Tate and the evaluation against those caused by the State, we conclude this factor does not weigh in Tate's favor.

### *Assertion of Right*

[¶35] The third factor this Court must consider in a constitutional speedy trial analysis is Tate's assertion of his right to a speedy trial. *See Griggs v. State*, 2016 WY 16, ¶ 68, 367 P.3d 1108, 1130 (Wyo. 2016). "Although a defendant is not required to assert his right to a speedy trial, the vigor with which the defendant asserted his right is an important consideration in determining the reasonableness of any delay." *Id*.

[¶36] Tate filed two demands for a speedy trial. *See supra* ¶¶7, 10. The first was made shortly after charges were filed, and the second followed his arraignment in district court after he was evaluated for fitness to stand trial. Although Tate did not oppose the State's motions for continuances, his demands to a speedy trial weigh in his favor.

### *Prejudice*

[¶37] The fourth and final factor requires an assessment of whether the delays described above prejudiced Tate. A defendant does not have to establish prejudice to succeed with a speedy trial argument, but prejudice or the lack thereof is an important consideration

when applying the *Barker* test. *Lafferty*, ¶ 60, 374 P.3d at 1254; *Moore v. Arizona*, 414 U.S. 25, 26, 94 S.Ct. 188, 189, 38 L.Ed.2d 183 (1973) (emphasizing that no single factor is a necessary or sufficient condition to the finding of a constitutional speedy trial violation); *Wehr*, 841 P.2d at 114 ("[A]lthough an affirmative showing of prejudice is not absolutely required to demonstrate a violation of the right to a speedy trial, prejudice is a 'very important factor[.]'").

[¶38]  Before analyzing the substance of this factor, we must first briefly discuss which party generally bears the burden of showing prejudice.  As we have already explained, *see supra* ¶30, presumptive prejudice simply provides the point at which the court must consider all the *Barker* factors.  The approach to be taken in determining which party has the burden to prove prejudice is plain and practical.  Although proving prejudice is not necessary to establish a denial of the constitutional right to a speedy trial, *see Moore*, 414 U.S. at 26, 94 S.Ct. at 189, if a defendant claims prejudice then he or she has the burden to demonstrate and substantiate the actual prejudice.  *See Jackson v. Ray,* 390 F.3d 1254, 1264 (10th Cir. 2004).  He or she is in the best position to establish it, and allocating the burden otherwise would require the State to prove a negative.  If a defendant fails to make a particularized showing of prejudice, the other three factors must weigh heavily in his or her favor in order to find a speedy trial violation.[8]

[¶39]   To evaluate prejudice for a speedy trial analysis, we must consider the interests that the speedy trial right was designed to protect: (1) prevention of oppressive pretrial incarceration; (2) minimization of the accused's anxiety and concern; and (3) minimization of the possibility that a delay will hinder the defense.[9]  *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193.  Impairment of the defense is the most important of these interests because the defendant's inability to adequately prepare and present his case can render a trial unfair. *Mascarenas*, ¶ 21, 315 P.3d at 663.  Pretrial anxiety is the factor of least significance, as there will always be a certain amount of pretrial anxiety in a criminal case.  As a result, a defendant must demonstrate extraordinary or unusual pretrial anxiety. *Lafferty*, ¶ 61, 374 P.3d at 1254. Prevention of oppressive pretrial incarceration, then, is the second most important.  *See United States v. Hicks*, 779 F.3d 1163, 1169 (10th Cir. 2015); *Barker*, 407 U.S. at 532-33, 92 S.Ct. at 2193.

---

[8] Practically speaking, both parties usually offer facts from the record on the issue to support their respective positions. The facts emphasized by the defendant may support actual prejudice; for instance "[i]f witnesses die or disappear during a delay, the prejudice is obvious." *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193.  Conversely, facts relied upon by the State can show an absence of actual prejudice.  If neither party presents facts, the effect is that the importance of the prejudice prong when balancing all the *Barker* factors will be dependent on the weights assigned to the other factors.

[9] This Court has consistently shorthanded these three interests by presenting them as follows:  "(1) lengthy pretrial incarceration; (2) pretrial anxiety; and (3) impairment of the defense." *Durkee*, ¶ 37, 357 P.3d at 1116; *see also Cosco v. State*, 503 P.2d 1403, 1405 (Wyo. 1972).

10

[¶40] Tate claims he suffered prejudice because he was incarcerated from his arrest to his trial, and he suggests that this incarceration necessarily impacted his employment opportunities, financial resources, and association. Being incarcerated for 387 days would indeed have some impact on his finances, employment opportunities, and his ability to associate with whom he chooses, but this length is not oppressive under the circumstances of this case. *See Barker*, 407 U.S. at 533-34, 92 S.Ct. at 2194 (deeming defendant's 10-month incarceration not sufficiently oppressive); *see also Lafferty*, ¶ 63, 374 P.3d at 1255 (finding defendant "has shown that he suffered lengthy pretrial incarceration, as 811 days is indeed extensive"); *Boucher v. State*, 2011 WY 2, ¶ 19, 245 P.3d 342, 351-52 (Wyo. 2011) (finding 368-day delay not sufficiently lengthy to be oppressive); *Mascarenas*, ¶ 22, 315 P.3d at 663 (determining incarceration for 332 days would have an impact on finances, employment opportunities, and the ability to associate with whom he chooses, thus the interest weighed in defendant's favor); *Berry v. State*, 2004 WY 81, ¶ 48, 93 P.3d 222, 237 (Wyo. 2004) (finding incarceration for 720 days "necessarily impacted his employment opportunities, financial resources and association" thus weighing heavily in defendant's favor); 5 LaFave, *supra,* § 18.2(e) (collecting cases from various jurisdictions on the issue).

[¶41] As to the second interest, minimizing Tate's anxiety and concern, our precedent requires that he show some special harm suffered which sets his case apart from the norm. *Lafferty*, ¶ 63, 374 P.3d at 1255. Tate's terse assertions are not sufficient to establish that the delay caused him an unusual level of anxiety. *See, e.g., Rhodes*, ¶ 20, 348 P.3d at 411; *Boucher*, ¶ 19, 245 P.3d at 351-52; *Mascarenas*, ¶ 22, 315 P.3d at 663.

[¶42] Lastly, we are unable to conclude that the delay impaired Tate's defense. He provides no cogent argument or support which would provide a basis to consider this interest in his favor. *See Durkee*, ¶ 38, 357 P.3d at 1116.

[¶43] Considering the three interests the speedy trial right was designed to protect in determining whether Tate was actually prejudiced, we conclude he did not meet his burden of showing that he was actually prejudiced by the delay. The fourth and final *Barker* factor, therefore, does not weigh in his favor.

### *Balancing of the Factors*

[¶44] The *Barker* analysis shows us that much of the delay ought to be heavily weighted on Tate's side of the scale. The delays surrounding the competency examination were much to blame. The State did not contribute to any significant delays in this case aside from those associated with court administration issues and two unchallenged continuances. Such delays are not heavily weighted against the State, however, as they cannot qualify as deliberate attempts to delay the trial in order to hamper the defense. Furthermore, the facts presented by the parties persuade us the Tate did not suffer actual prejudice and the 387-day delay did not substantially impair his right to a fair trial.

[¶45] After balancing the *Barker* factors, we can only conclude that there was no violation of Tate's constitutional right to a speedy trial.

[¶46] Affirmed.